**Henry HENDLER, Paul Garrett, Tillie Goldring, as Trustees, and Henry Hendler and Irving Gronsky, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 456–84L.

United States Claims Court.

Oct. 24, 1986.

---

Jerrold A. Fadem, Santa Monica, Cal., for plaintiffs; Fadem, Berger & Norton, Michael M. Berger, and Robert P. Oliker, of counsel.

David F. Shuey, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, for defendant; Elizabeth A. Peterson, of counsel.

## MEMORANDUM ORDER

MAYER, Judge.

Plaintiffs claim a taking of their land by the United States Environmental Protection Agency in violation of the fifth amendment of the Constitution. The case is before the court on cross-motions for summary judgment.

### Background

Plaintiffs own property in Riverside County, California, which is located near the Stringfellow Acid Pits (Stringfellow), a toxic waste disposal site. Federal and State of California (state) studies determined that hazardous substances, pollutants, and contaminants dumped at Stringfellow had been released into the environment and that a plume of groundwater contaminated with these hazardous substances was threatening to enter the Chino III Groundwater Basin, a major source of drinking and agricultural water. To monitor and contain these hazardous substances, the United States Environmental Protection Agency (EPA) requested access to plaintiffs' property to install wells.

When access was denied, EPA issued an administrative order which directed plaintiffs to provide access to three specific parcels of property. *See* sections 106(a), and 104(a), (b), and (e), of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9606(a), 9604(a), (b), (e).

The order required, *inter alia*, that EPA officials and other authorized personnel, including state officials, be given

A. Access to [plaintiffs' property] for the following purposes: (1) locating[,] constructing, operating, maintaining, and repairing, monitor/extraction wells; (2) taking measurements and samples from those wells; (3) performing groundwater extraction operations, if necessary, including off-site disposal of such extracted groundwater.

B. Access to [plaintiffs' property] to accomplish all the activities described in paragraph A of this Order, and any necessary activities incident thereto, which shall include but shall not be limited to storing and transporting groundwater, and constructing facilities for such purposes, and the installation, operation, maintenance and repair of electric lines, pipes and storage tanks.

C. Access to [plaintiffs' property] to conduct any and all other activities necessary to investigate, monitor, survey, test and perform information gathering to identify the existence and extent of the release of hazardous substances or the threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of the danger to the public health or welfare or to the environment.

The order also required that "any future access" be assured "for the purpose of containing and terminating the release and threatened release of hazardous substances, pollutants and contaminants." Plaintiffs were "ordered not to interfere in any manner with EPA/State activity" on their property. The order said failure to comply could lead to significant civil penalties, including punitive damages. An order

like this is issued if there "may be an imminent and substantial endangerment to the public health or welfare or the environment ...," 42 U.S.C. § 9606(a), and the propriety of its issuance is not contested here.

Pursuant to the order, defendant entered plaintiffs' property and embarked on monitoring activities. On this record, it is unclear how much of the property is affected. Plaintiffs' complaint and first amended complaint claimed defendant had entered the three parcels set out in the EPA order. The second amended complaint expanded the list of property to thirteen parcels. However, only two of the three parcels included in the EPA order are among the thirteen. The proximity of the eleven parcels not listed in the EPA order to the other two parcels remains obscure, although plaintiffs contend their property is one conterminous tract. In short, the court does not know what property or portions of property plaintiffs' suit is based on, or the extent of the property allegedly affected by defendant's activities. This will have to be precisely established as this case goes forward.

Defendant installed five monitoring wells which may also be used to extract contaminated water if necessary. According to defendant they measure six to eight inches in diameter and are covered by a steel box measuring approximately four feet by four feet by two feet. Plaintiff adds the wells are up to 100 feet deep, lined with concrete, steel, and plastic, and capped with a concrete casing.

According to defendant, the wells have been used for groundwater monitoring from the time each was completed to the present. Sampling from each well is performed monthly, or less often, and requires that the well first be purged by pumping out several hundred gallons of water to get a representative sample of the groundwater. The purged water is disposed of at a hazardous waste disposal facility. Samples taken for testing are quite small. When a sample is taken, a truck is driven onto plaintiffs' land to transport the pumping equipment to the well site and remains for a short time during the sampling procedure. On one occasion, a "step drawdown test" was conducted to determine water production rates for each of the wells. This enables EPA to determine how much water could be pumped from the wells if they are used for extraction of contaminated groundwater in the future. Each test was conducted over twelve to sixteen hours, during which EPA set up temporary water tanks next to each of the wells and pumped water into them for the test period.

In contrast, plaintiffs say EPA has driven machinery, trucks and other vehicles indiscriminately across their property for drilling wells, extracting water, taking soil and "a myriad of other reasons." They say the wells are continuously monitored, and every time a new well is drilled more vehicles and EPA employees "invade" the property. They say dozens of reports have been prepared on Stringfellow, and every time a report is prepared, another government agent comes on their property to gather data. They claim EPA has performed numerous soil investigations on their property, at least four of which were conducted by inserting dozens of probes five to ten feet into the ground to extract gas. At least 151 soil samples have been removed for analysis. One soil investigation involved driving steel rods three feet into the ground and injecting 810 volts of electricity. At least one "seismic refraction survey" was conducted to determine the location of earthquake faults, by detonating explosives on the property. Finally, plaintiffs say, and defendant denies, that when EPA pumps toxic wastes to the surface, it creates a health hazard. As this recitation shows, the record is not clear about what is happening on plaintiffs' property. In the court's view, it is important to know this to confidently resolve this case.

The state has also installed at least thirteen wells and its personnel, as well as those of EPA, have engaged in activities on the property. Tests have found contaminated groundwater on plaintiffs' property,

indicating that the contaminant plume from Stringfellow has progressed at least that far. From all of this, plaintiffs' claim their property has been taken by defendant.

### Discussion

The fifth amendment of the Constitution provides that "private property [shall not] be taken for public use, without just compensation." Nevertheless, "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960). But the Supreme Court has been "unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government...." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). It has relied on "ad hoc, factual inquiries" into the circumstances of each case. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). The inquiries are guided by three factors of "particular significance:" (1) "the economic impact of the regulation [or action] on the claimant;" (2) "the extent to which the regulation [or action] has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659; *Connolly v. Pension Benefit Guaranty Corporation,* 475 U.S. 211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

Supreme Court taking cases
can be divided into two lines of authority: the so-called regulatory taking cases and the physical occupation cases. Regulatory taking cases are those where the value or usefulness of private property is diminished by regulatory action not involving a physical occupation of the property.... Physical occupation cases are those where the government physically intrudes upon private property either directly or by authorizing others to do so.

*Hall v. City of Santa Barbara,* 797 F.2d 1493, 1497 (9th Cir.1986); *see Althaus v.*

*United States,* 7 Cl.Ct. 688, 693 (1985). We have allegations of both kinds in this case. Plaintiffs say first the EPA order by itself constitutes a taking of their property. Even if it does not, however, they claim the physical occupation of their property by defendant is a permanent taking. Their final argument is that the state is the agent of the United States, and defendant is responsible for the state's actions on their land to the same extent it is responsible for its own. The court will address these arguments in turn.

### I

■ In maintaining that mere issuance of the EPA order constitutes a taking, plaintiffs rely on *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884 (Fed.Cir.1983). There, plaintiffs owned the mining rights to land owned by the government. The government erroneously informed them that they had no mining rights, and ordered them not to extract precious metals from the property. They complied with this directive. The court held that this may have been sufficient for a taking, even if the government did not take physical possession or physically bar plaintiffs from the property. *Id.* at 887. They were not required to challenge the government by attempting to violate the order.

The order in our case is different. On its face it did not purport to dispossess plaintiffs or limit their use of the property. It was not functionally equivalent to seizure of the property or restraint on entry and use. While its terms were expansive, they were not necessarily inimical to simultaneous use of the property by plaintiffs, as long as they did not interfere with defendant's admittedly beneficial activities. As a matter of fact, the property was undeveloped and unused, so there was no possibility of conflict between the order and plaintiffs' use. The *Yuba* order, on the other hand, prevented the only use those plaintiffs had for their property interest, and stopped their ongoing mining operation.

As in *Yuba,* however, resolution of the facial challenge to the EPA order in our

case is guided by the notion that "what counts is not what [the] government said it was doing.... What counts is what the government *did.*" 723 F.2d at 889. Until the order was executed, defendant had not done anything to the property or to plaintiffs' rights in it. The "mere existence of authority to regulate did not itself constitute the taking...." *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 894 (Fed.Cir.1986).

*Hodel v. Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), considered whether the "mere enactment" of the Surface Mining Act was a taking. The Court observed that in a facial challenge, a taking occurs if the statute "denies an owner economically viable use of his land...." *Id.* at 296, 101 S.Ct. at 2370, quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). In this case, plaintiffs have not suggested how they have been denied "economically viable use" of their land by the mere issuance of the order. At most, they complain they have been deprived of the right to exclude others. But this is only one of the full "bundle" of property rights. "[D]estruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979). Similarly, in *Danforth v. United States,* 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939), the "mere enactment" of condemnation legislation was not a taking. The Court reasoned that "[s]uch legislation may be repealed or modified, or appropriations may fail." *Id.* at 286, 60 S.Ct. at 237. At the moment the EPA order was issued in this case, there was no way of knowing, even if it could be supposed, how or if it would be applied.

The court appreciates that the fact specific nature of taking claims requires caution in granting summary judgment. *Yuba,* 723 F.2d at 887. But plaintiffs have provided no basis in fact to support a taking by the mere issuance of the EPA order. Defendant prevails on this question.

## II

■ Looking to the invasive component of their claim, plaintiffs assert that EPA has permanently occupied their property by installing monitoring and extraction wells and conducting extensive operations. Defendant first raises a generalized defense that its activity is a valid exercise of the police power to protect the health and safety of the community; therefore it cannot be charged with a taking of the property. The first part of the argument is reasonable and commonsensical, plaintiffs do not question it, and the court accepts it without analysis. But it is a "separate question" whether defendant's activity "so frustrates property rights that compensation must be paid." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 425, 102 S.Ct. 3164, 3170, 73 L.Ed.2d 868 (1982).

There is no question here that defendant is acting in the public interest, only whether what it has done resulted in deprivation of private property for which the Constitution requires payment. "[W]hen the 'character of the governmental action,' *Penn Central,* 438 U.S. at 124 [98 S.Ct. at 2659], is a permanent physical occupation of property, [the Supreme Court] uniformly [has] found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto,* 458 U.S. at 434, 102 S.Ct. at 3175. A permanent physical occupation is a "taking without regard to other factors that a court might ordinarily examine." *Id.* at 432, 102 S.Ct. at 3174.

To that, defendant responds that its presence on plaintiffs' land is not permanent. The installation of wells and other monitoring, detection and removal activities are responses to an emergency. The equipment and personnel will depart as soon as the contaminants have been controlled and removed. In the meantime, defendant's use of the property is infrequent and intermittent, and it does not in any way interfere with plaintiffs' use of it. At most, defendant has taken an easement or servi-

tude, not a fee interest. Plaintiffs controvert this with assertions of their own that the equipment is permanently installed, and the activities are continual and of indefinite duration. They say they therefore can make no use of their property.

As noted at oral argument, the difficulty for the court is that, notwithstanding these counter arguments, the record affords insufficient evidence upon which to base a decision. If the wells are indeed permanent, or perhaps removable but of indefinite duration, then *Loretto* teaches that plaintiffs have suffered a permanent taking of some dimension. If defendant is right that the wells take up only five patches of land each measuring four feet square, and do not otherwise diminish plaintiffs' use of the property, then, presumably, their recovery will be more nominal than significant. If plaintiffs are right about the extent and duration of the intrusion, however, defendant may have taken the whole property, though it has yet to be precisely defined on this record.

It is not dispositive of the question of permanency that the installations might someday be removed, and government activities cease. "A governmental taking can always be undone if the government so chooses. That has never defeated a taking claim." *Hall v. City of Santa Barbara,* 797 F.2d at 1499. What we need to know, and what this record does not disclose, is whether the devices are truly permanently affixed to plaintiffs' property, whether defendant's ancillary activities are of finite or indefinite duration, and whether they are as pervasive as plaintiffs say they are.

### III

"Not every physical *invasion* is a taking." *Loretto,* 458 U.S. at 435 n. 12, 102 S.Ct. at 3176, n. 12. Because "they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property," temporary physical invasions are subject to a balancing process. *Id.* If the evidence shows the absence of a permanent taking, to decide whether a temporary taking has occurred the court will need to know the character and expected duration of the government activity, and the degree of interference with the private property. *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82–84, 100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741 (1980). The next inquiry is the economic impact of the EPA actions. There is nothing before the court showing how the EPA actions have affected the potential or expected uses or worked a diminution in the value of this property, which at present is apparently arid, undeveloped land, but contiguous to Glen Avon with access to a major highway.

The court would also look at the extent to which the EPA actions interfered with the distinct investment-backed expectations of plaintiffs. The early case of *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), is instructive. In finding a taking, it held that a Pennsylvania statute, which prevented subsurface coal mining unless the surface rights to the land were owned by the same party, interfered with the investment-backed expectations of the plaintiffs who had sold the surface rights before enactment of the statute. *C.f. Keystone Bituminous Coal Assn. v. Duncan,* 771 F.2d 707 (3rd Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 1456, 89 L.Ed.2d 714 (1986). But, again, our plaintiffs give no hint of how defendant's activities may have affected their investment-backed expectations, or even if they had any.

As discussed earlier, the character of the governmental action itself has not been fully developed. Plaintiffs claim that in addition to the wells, defendant has "indiscriminately" driven trucks, machinery, and other vehicles across their land, exercised complete dominion over it, removed soil, drilled 100 feet or more, detonated explosives, and created a health hazard by bringing toxic wastes to the surface. And there is no end in sight. Defendant responds that its use of the land has been carefully limited to minimize any interference, and plaintiffs' allegations are either wrong, incomplete or exaggerated. It refers the court to the stipulation of facts, but that is

not comprehensive enough to resolve this debate. So, the nature and extent of the government's actions on plaintiffs' property are unclear, and the matter is inappropriate for summary judgment.

It is not inappropriate to observe, however, that defendant's heavy reliance on *YMCA v. United States*, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969), for the proposition that a temporary intrusion on private property undertaken to counter a serious threat to public health or safety does not give rise to a taking, is misplaced. *YMCA* is an example of an "unusual circumstance[ ] in which governmental occupation does not deprive the private owner of any use of his property." *Id.* at 93, 89 S.Ct. at 1516. United States troops occupied plaintiffs' building to protect it from rioters in the Panama Canal Zone. The occupation did not deprive the owners of any use of their building because it was then under heavy attack. *Id.* In contrast, the governmental action in our case at least arguably deprives plaintiffs of some of their property, if not all of it, and the duration of the occupancy, approximately three years and continuing, is more significant than the one day the troops spent in the *YMCA* building.

*YMCA* is limited to situations where "the private party is the particular intended beneficiary of the governmental activity." *Id.* at 92, 89 S.Ct. at 1515. It is only then that " 'fairness and justice' do not require that losses which may result from [the governmental] activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public." *Id.* Our case is the converse. The general public, and especially the thousands who use the Chino III Groundwater Basin, are the "particular intended beneficiar[ies];" plaintiffs benefit only incidentally when their property ultimately becomes contaminant free.

## IV

▉ Plaintiffs say defendant is responsible for the activities of the state on their property because either the state is its agent, or they are joint tortfeasors. The court has no jurisdiction over cases sounding in tort, so the latter allegation does not help plaintiffs. They see an agency relationship because the state has installed at least thirteen monitoring wells on plaintiffs' property and, through a cooperative agreement, defendant has paid 90 percent of the expenses.*

▉ Whether an agency relationship exists turns on whether the "purported principal exerts the requisite control over the [alleged agent] so as to create an agency relationship." *Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1343 (8th Cir.1976). *See also* Restatement (Second) of Agency § 1 (1958). Plaintiff relies on *Martarano v. United States*, 231 F.Supp. 805 (D.Nev. 1964), in which agency was found between a state employee and the federal government based on a cooperative agreement. In contrast to our case, however, the cooperative agreement between the state and federal governments in *Martarano* required "direct [federal] supervision" of "all operations." The court found that the parties acted in accordance with the express terms of the agreement, and the state employee was in fact under the control of the federal government which was bound by his actions. *Id.* at 808. No direct supervision exists here and EPA has avoided activity which goes beyond close cooperation.

Award of federal grant funds does not convert a state project into a federal one. *D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505, 507 (Ct.Cl.1967). The federal government can require "projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise, the will of Congress would be thwarted...." *Id.* For example, although the Federal Aid Highways Act contemplates "close cooperation" between the United States and individual states, "the states or their agencies or offi-

---

* At some places in the papers, the parties say defendant paid 100 percent of the cost of the wells. The percentage is irrelevant to the court's resolution of this issue.

cials were in no sense to become agents of the United States...." *Eden Memorial Park Assn. v. United States,* 300 F.2d 432, 439 (9th Cir.1962). So federal control and supervision of grant funds issued to a state do not make the state an agent of the federal government. *D.R. Smalley,* 372 F.2d at 507; *Somerville Technical Services v. United States,* 640 F.2d 1276, 1279 (Ct.Cl.1981); *see DeRoche v. United States,* 2 Cl.Ct. 809, 812 (1983). The "funding and approval of local projects by the federal government does not make the local authority the federal government's agent so as to constitute a taking." *C.S. Lenoir v. United States,* 618 F.2d 125, 222 Ct.Cl. 499, 501 (1979); *see Griggs v. Allegheny County,* 369 U.S. 84, 89, 82 S.Ct. 531, 533, 7 L.Ed.2d 585 (1962).

Plaintiffs cite a clause in the cooperative agreement as proof that defendant directly controls state action.

> The State agrees to submit all final plans, reports, specifications, contract documents and changes, and/or recommendations to the EPA Project Officer prior to issuance for review to ensure technical adequacy and consistency with the National Contingency Plan, other EPA guidance and the scope of work of this Agreement. Unless the EPA Project Officer objects to the contents of any submission within a 30–day period, the EPA will be deemed to have concurred.

These conditions, however, fall squarely within the contemplation of *D.R. Smalley.* There, plaintiff showed, *inter alia,* that the contracts involved were drafted in accordance with federal regulations and requirements and were approved by the federal government; changes in plans were approved by the federal government; work was inspected and approved by the federal government; and most of the funds for the

project were federal. The court, nevertheless, held these indicia insufficient to create an agency relationship. 372 F.2d at 506–8. Plaintiffs' case is no stronger.

Upon accepting the cooperative agreement, the state is required to "efficiently and effectively manage [the] project, successfully complete the project according to the schedule, and meet all monitoring and reporting requirements." 40 C.F.R. § 30.-309. The evidence of record shows that EPA works in close cooperation with state personnel and contractors, observes the work, and reviews it for technical and financial compliance with the cooperative agreement. This is not control. Apparently, defendant has assigned one employee to "work for" the state at Stringfellow, and plaintiffs suggest this is evidence of an agency relationship. For all that appears, however, this might make the employee an agent of the state, *see Martarano,* 231 F.Supp. 805, but does not make the state the agent of defendant. If plaintiffs have evidence that goes beyond cooperation, they have not presented it. *See Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983).

■ The cooperative agreement itself says that it shall not "be construed to create, either expressly or by implication, the relationship of agency between EPA and the State." And the "State ... is not authorized to represent or act on behalf of EPA in any matter related to the subject matter of this Agreement." These statements are not necessarily dispositive, of course, *see Board of Trade v. Hammond Elevator Co.,* 198 U.S. 424, 437, 25 S.Ct. 740, 743, 49 L.Ed. 1111 (1905), but together with the conditions of the cooperative agreement and the activities of the contracting parties, they show that the state is responsible for its own activities.** Therefore, this case is limited to consideration of

---

** As proof of agency, plaintiffs point to the EPA administrative order which directed them to grant access to state as well as federal officials. But the order did not change the grantor-recipient relationship to one of agency; the cooperative agreement defines the relationship and the contracting parties' conduct confirms it. De-

fendant says in any event California Health and Safety Code §§ 25100 *et seq.* and 25300 *et seq.* give the state independent authority to enter plaintiffs' property in these circumstances. This argument is not developed, however, and plaintiffs do not address it, so the court expresses no view.

whether or not federal activities resulted in a taking; the court has no jurisdiction over the state.

### Conclusion

Accordingly, it is ORDERED that plaintiffs' motion for summary judgment is DENIED, and defendant's cross-motion for summary judgment is GRANTED in part and DENIED in part. Further proceedings will be scheduled by separate order.