**V.J. SCOGIN, Sr., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–1068L.

United States Court of Federal Claims.

April 14, 1995.

V.J. Scogin, Sr., Slidell, LA, pro se.

Andrew M. Eschen, Washington, DC, with whom was Asst. Atty. General Lois J. Schiffer, for defendant.

### *ORDER*

MILLER, Judge.

This case is before the court on defendant's motion to dismiss pursuant to RCFC 12(b)(4) for failure to state a claim upon

which relief can be granted. Plaintiff has opposed. Argument is deemed unnecessary.

## FACTS

The following facts are derived from plaintiff's complaint. Virgil J. Scogin, Sr. ("plaintiff"), owns an industrial parcel of approximately 7.8 acres abutting the Bayou Bonfouca Superfund Site (the "Site"). The Site, an abandoned creosote wood treatment facility located in the City of Slidell, St. Tammany Parish, Louisiana, consists of approximately 53 acres, including nearly 4000 feet of navigable waterway known as the Bayou Bonfouca and its banks. Plaintiff is the President of Standard Materials, Inc., an enterprise involved in the preparation of pre-stressed concrete pilings.

From 1892 to 1970, the Site was operated as a wood treatment facility, which used creosote to treat formed lumber, such as telephone poles and railroad ties. In 1976 the United States Coast Guard discovered creosote in the sediments underlying the Bayou Bonfouca waterway. On September 28, 1983, the Environmental Protection Agency (the "EPA"), pursuant to section 105(a)(8)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9605(a)(8)(B) (1988) ("CERCLA"), placed the Site on the National Priorities List (the "NPL"). The NPL, promulgated at 40 C.F.R. pt. 300, app. B (1994), identifies those sites at which releases or threatened releases of hazardous substances are found to present the greatest threats to public health and the environment. The soil, groundwater, Bayou sediments, and surface waste piles at the Site were found to contain hazardous substances, as defined by section 101(14) of CERCLA, 42 U.S.C. § 9601(14). *See* 40 C.F.R. § 302.4. Plaintiff's property itself is not contaminated and is not part of the Site.

The EPA conducted numerous public hearings to discuss potential remedial measures for the Site. On March 31, 1987, the EPA issued the Record of Decision. The remedy selected included the excavation and removal of contaminated Bayou sediments. This approach contemplated, among other things, the use of subsurface sheetpiles to support the banks of the Bayou during dredging. Other measures included installing and reading of air monitors and surveying equipment at the Site. In order to carry out these remedial measures, the EPA required access to plaintiff's property. 42 U.S.C. § 9604(a)–(b).

On a date that does not appear in the record, plaintiff requested a meeting with EPA representatives in order to discuss the impact of the proposed remedial action on plaintiff's barge-docking area. By letter dated February 26, 1987, Kathleen O'Reilly, a geologist with EPA Region VI (later Region 6) in Dallas, Texas, declined plaintiff's request. Ms. O'Reilly noted: "We will certainly work with you on this problem and have no intention of rendering your company unable to perform contracted work...." Ms. O'Reilly explained, however, that until the remedial plans were more fully developed and the actual impact of such plans on plaintiff's docking area was known, a meeting would be premature.

On October 16, 1989, Robert M. Griswold, Remedial Project Manager, EPA Region 6, contacted plaintiff regarding the drilling of subsurface borings on plaintiff's property. By letter dated October 17, 1989, Mr. Griswold informed Bren Bishop, Vice President and General Manager of Administration of Standard Materials, that the EPA "and its contractors will coordinate all locations of these borings with you or your authorized representative...." Mr. Griswold enclosed a form entitled "CONSENT FOR ACCESS TO PROPERTY" for Mr. Bishop's signature. This form purported to allow access to plaintiff's property for the following purposes:

1. The installation of such equipment as necessary to support sheet piling or other similar type slope stabilization methods;

2. The installation of slope monitoring equipment such as inclinometers to be placed in bore holes;

3. Placement of monitoring equipment such as air monitors, surveying equipment, etc.;

4. Access to install and measure the aforementioned equipment;

5. Other items as necessary to carry out the remedial action as outlined in the project's Record of Decision and Explanation of Significant Differences.

The form stated that "[t]he term of this agreement shall cease 7 years from the date of which the instrument herein was signed by the owner(s)...." Plaintiff did not sign this document. Instead, on October 18, 1989, Mr. Bishop, on behalf of Standard Materials, signed a similar form, which differed from the original in two respects. First, the "purposes" in the original form were replaced with the following: "1. The taking of such soil samples as are determined necessary to investigate the subsurface materials." Second, the stated term of the agreement was two months, instead of seven years. In late 1989 and early 1990, the EPA took soil borings from plaintiff's property.

The record indicates that by letter dated August 20, 1990, plaintiff contacted Ben J. Harrison, Assistant Regional Counsel, EPA Region 6, to inquire about the effects of the remedial work being conducted at the Site. Mr. Harrison responded on November 1, 1990:

I fully realize that closure of the Bayou may have an adverse economic impact on your operations. Any losses which you may suffer during the remedial action are the result of prior releases of creosote into the Bayou. The law allows any person to bring suit in his own behalf against any other person alleged to be in violation of any standard, regulation or requirement which has become effective pursuant to ... [CERCLA]. Under this law, you may pursue legal action against any party responsible for the release of the creosote into the Bayou.

Mr. Harrison also stated:

The signing of the consent to access agreement is a separate issue. Regardless of whether you have a claim against EPA because of the closure of the Bayou, you will still be required to allow the Agency and Agency contractors access to your property. The Agency has asked that you give this consent voluntarily. You have indicated that you will not give such consent. If your consent is not granted, EPA is authorized to issue an administrative order pursuant to 42 U.S.C. § 9604(e). EPA is also authorized to ask the Attorney General to commence a civil action to compel access or to enforce an administrative order. Under this section, the court may require compliance with the order and issue a fine of up to $25,000 per day of noncompliance....

On June 18, 1991, EPA Region 6 issued an order pursuant to CERCLA, 42 U.S.C. § 9604(e)(5), requiring plaintiff to allow the EPA access to his property. Plaintiff filed a complaint in the United States District Court for the Eastern District of Louisiana, *V.J. Scogin, Sr., v. United States EPA Region 6 et al.,* Civ.A. No. 91–2753 (E.D.La., filed July 27, 1991). Alleging an unconstitutional taking, plaintiff sought both permanently to enjoin the EPA from entering his land and money damages. On January 14, 1992, the district court granted the United States' motion to dismiss, ruling that CERCLA, 42 U.S.C. § 9613(h), precludes judicial review of EPA remediation activities until the EPA itself brings an enforcement action. The district court also held that it lacked jurisdiction to award plaintiff monetary damages, since a takings claim in excess of $10,000.00 is within the exclusive jurisdiction of the United States Court of Federal Claims. Plaintiff then appealed the district court's order to the United States Court of Appeals for the Fifth Circuit. *See Scogin v. Region 6 Environmental,* 987 F.2d 771 (5th Cir.1993) (Table).

Plaintiff filed a "Petition for Review" in the United States Court of Appeals for the District of Columbia Circuit. *V.J. Scogin, Sr. v. EPA,* No. 91–1341 (D.C.Cir., filed July 19, 1991). Plaintiff challenged the same "Unilateral Administrative Order" that was the subject of the district court action. On September 17, 1991, the United States filed a motion to dismiss. On March 22, 1992, the D.C. Circuit stayed proceedings pending disposition of plaintiff's appeal to the Fifth Circuit.

While the appeal to the Fifth Circuit was pending, the United States filed a complaint together with a Motion for an Immediate Order in Aid of Access in the United States District Court for the Eastern District of Louisiana. *United States v. V.J. Scogin, Sr.,*

*et al.*, Civ.A. No. 92–3620 (E.D.La., filed Nov. 3, 1992). On December 17, 1992, the district court entered an order authorizing access to plaintiff's property. The order states that the EPA

> shall have complete access to ... [plaintiff's] property for the purpose of effectuating remedial actions, at the Bayou Bonfouca Superfund Site, that the EPA deems necessary to address the threat to human health and the environment posed by the release or potential release of hazardous substances. The EPA shall have access for a time that is reasonably necessary to complete such activities[.]

The order further stated that plaintiff was enjoined from in any way interfering with the access of the EPA ... to ... [plaintiff's] property for the above-stated purpose, including the installation and reading of air monitoring equipment, the installation and maintenance of subsurface sheet piling anchors or other slope stabilization methods, and any other actions necessary to carry out the cleanup remedy selected by the EPA[.]

On February 18, 1993, Standard Materials entered into a lease agreement with IT–OHM, A Joint Venture ("IT–OHM"), for two parcels of land owned by plaintiff adjacent to the Site. IT–OHM is the principal remedial contractor for the EPA at the Site. The two parcels of land leased to IT–OHM by Standard Materials constitute approximately four acres out of a larger tract of land defined at "Entry 548670" in a land recordation book describing the sale of approximately 7.8 acres of land by the Alabama Great Southern Railroad Company to plaintiff. The lease agreement contains the following provisions:

> *ARTICLE 2.* IT–OHM, A Joint Venture will use said Premises for purpose of temporarily storing materials, equipment and parking vehicles for their use.
>
> *ARTICLE 3.* IT–OHM, A Joint Venture will pay unto Standard Materials, Inc. as rent the sum of TWENTY FOUR THOUSAND ... ($24,000.00), payable monthly in advance in installments of $2,000.00 per month, beginning as of the *1st* day of *February, 1993,* which is the effective date hereof.... This agreement

shall not be subject to termination by Standard Materials, Inc. unless IT–OHM, A Joint Venture has defaulted hereunder. However, IT–OHM, A Joint Venture shall have the option to terminate this Lease should its contract with the United States Army Corps of Engineers be terminated for any reason. Upon the end of the lease term, IT–OHM, A Joint Venture, at its option, may continue the lease term on a month to month basis for the $2,000.00 per month until terminated in writing by Standard Materials, Inc.

> ....

> *ARTICLE 5.* IT–OHM, A Joint Venture shall pay, satisfy, and discharge all claims, judgements, and liens for material and/or labor, used or employed by IT–OHM, A Joint Venture or its agents in the construction, repair, maintenance, or removal of any buildings or structures located upon the Premises, whether the buildings or structures shall, under the terms of this agreement, be the property of Standard Materials, Inc. or IT–OHM, A Joint Venture, and IT–OHM, A Joint Venture shall indemnify and save harmless Standard Materials, Inc., its officers, agents and employees, from all such claims, judgments, liens, or demands whatsoever.

> ....

> *ARTICLE 15.*

> ....

> (b) Upon the termination of this agreement, for what ever [sic] cause, IT–OHM, A Joint Venture will vacate the Premises immediately, remove all improvements owned or placed thereon by IT–OHM, A Joint Venture, and leave the Premises, including the subsurface, in as good order and condition as said premises may have been prior to the use and occupation thereof by IT–OHM, A Joint Venture and free from holes, obstruction, debris, waste, or contamination caused by waste introduced by IT–OHM, A Joint Venture, of any kind;

> (c) If IT–OHM, A Joint Venture fails to restore the Premises as provided herein prior to the date the IT–OHM, A Joint Venture is required to vacate such premises, then Standard Materials, Inc. may, at

its option but at the sole cost and expense of IT–OHM, A Joint Venture, remove or arrange to remove all such property, improvements, .obstructions, debris, waste, and contamination by substances brought onto the Premises by IT–OHM, A Joint Venture, and restore or arrange to restore both the surface and subsurface of the Premises to as good order and condition as said Premises may have been prior to the use and occupation thereof by IT–OHM, A Joint Venture excepting that contamination surface or subsurface conditions existing as a result of preexisting substances, materials, or hazardous conditions. Promptly upon billed [sic] rendered by Standard Materials, Inc., IT–OHM, A Joint Venture shall pay to Standard Materials, Inc. the total cost of such removal and restoration, including, but not limited to, the cost of cleaning up and removing any contaminated soil or water.

. . . .

*ARTICLE 17.* In addition to any other rights of entry reserved herein, Standard Materials, Inc. reserves unto itself and its permittees the right to enter upon said Premises at any time for operation, maintenance, reconstruction, repair, or relocation of any building, trackage, or other structures located on said Premises; for inspection of the Premises, for taking whatever corrective actions the Standard Materials, Inc. deems necessary to eliminate any violation of articles 6, 7, 8, and 9 if, in the Standard Materials, Inc.'s judgement, the steps taken by IT–OHM, A Joint Venture are inadequate or not timely; and for any other lawful purpose. Standard Materials, Inc. shall use its best efforts not to interfere with IT–OHM, A Joint Venture's use of the Premises during such entry.

On March 1, 1993, the Fifth Circuit affirmed, in part, without opinion, the district court's dismissal of the complaint, *Scogin v. Region 6 Environmental,* 987 F.2d 771, but vacated that portion of the district court's order that had refused to transfer the complaint to the Court of Federal Claims. On March 24, 1993, the district court entered an order transferring plaintiff's claim for monetary damages.

Plaintiff filed a complaint alleging a taking in the Court of Federal Claims. *V.J. Scogin, Sr. v. United States,* No. 93–204L (Fed.Cl., filed May 3, 1993). Plaintiff's aforementioned "Petition for Review," however, was still pending in the D.C. Circuit. Accordingly, defendant moved for dismissal pursuant to 28 U.S.C. § 1500 (1988), which divests the court of jurisdiction over a previously filed claim against the United States based on the same operative facts. On December 8, 1993, the D.C. Circuit dismissed plaintiff's "Petition for Review." Thereafter, plaintiff filed a notice of voluntary dismissal of his complaint in this court. On December 13, 1994, Judge Horn entered an order dismissing that action. On December 15, 1994, plaintiff filed the instant suit.

Defendant moved to dismiss on the basis that the district court's order requiring plaintiff not to interfere with the EPA's access fails to state a claim for a taking. Plaintiff opposed and moved for summary judgment. Defendant replied and cross-moved, submitting a copy of a lease whereby plaintiff and an EPA contractor agreed upon compensation to plaintiff for allowing access to the subject property. For the reasons given below, the court will not further consider plaintiff's motion for summary judgment. Defendant's motion to dismiss, amplified by its cross-motion for summary judgment, will be resolved before this matter proceeds further.

**DISCUSSION**

1. *Takings*

The Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The determination whether a compensable taking has occurred ordinarily depends on "ad hoc, factual inquiries." *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *accord Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3170, 73 L.Ed.2d 868 (1982).

Traditionally, the permanent physical occupation of private property by the Govern-

ment, in nearly all cases, would constitute a compensable taking. *Loretto,* 458 U.S. at 426–27, 102 S.Ct. at 3170–71. Early takings jurisprudence focused primarily on these direct physical encroachments. *E.g., Pumpelly v. Green Bay Co.,* 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872) (taking found where state-authorized dam permanently flooded plaintiff's property). The advent of the modern regulatory state, however, has resulted in a more complex inquiry into whether a taking has occurred. A statute or regulatory scheme work a taking in one of two ways. First, a statute that regulates activities on land, such as CERCLA, may effect a *per se* taking where the regulation necessitates a permanent physical occupation of the subject property. *Loretto,* 458 U.S. at 426–27, 102 S.Ct. at 3170–71. Second, a regulatory scheme may effect a taking where, without involving a direct governmental presence on the subject property, the regulation nevertheless significantly frustrates the owner's property rights. *Penn Cent.,* 438 U.S. at 127–28, 98 S.Ct. at 2660–61.

The Supreme Court developed the analytic treatment governing this latter scenario in *Penn Central.* The Court identified non-inclusive factors relevant to the question whether a given regulation works a taking: The character of the governmental action, the economic impact of the regulation on the property owner, and particularly the degree to which the regulation interferes with the property owner's reasonable investment-backed expectations. 438 U.S. at 124, 98 S.Ct. at 2659. This multi-factored approach has often resulted in the Supreme Court upholding "substantial regulation of an owner's use of his own property where deemed necessary to promote the public interest." *Loretto,* 458 U.S. at 426, 102 S.Ct. at 3170. This approach does not apply when the Government's intrusion amounts to a permanent physical occupation of the owner's property. If the governmental action results in a permanent physical presence, a taking has occurred "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434–35, 102 S.Ct. at 3175. On the other hand, when a physical invasion that can be characterized as temporary takes place,

courts are to apply the balancing test under *Penn Central. See id.* at 435 n. 12, 102 S.Ct. at 3175 n. 12.

In *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991), the Federal Circuit addressed the question whether the EPA's physical intrusion onto private property constituted a taking. In that case the EPA undertook a broad-ranging CERCLA remediation plan designed to combat groundwater contaminants from the Stringfellow Acid Pits, a major hazardous waste site in California. The remediation strategy required the EPA, in conjunction with the state, to monitor the flow of contaminated groundwater on nearby properties. The EPA sought permission to enter a nearby property in order to install a series of wells. The owners refused. The EPA then issued an administrative order granting itself access to the landowners' property for the purpose of " 'locating, constructing, operating, maintaining, and repairing monitor/extraction wells.' " *Hendler,* 952 F.2d at 1369. The owners were ordered not to interfere with the EPA remediation activities. Subsequently, the EPA installed five wells on the property; the State of California, 13.

The owners brought suit in the Claims Court alleging a Fifth Amendment taking. On summary judgment the trial court turned first to the question whether a regulatory taking had occurred. The court held that the 1983 EPA Order itself did not constitute a taking because the order's terms "were not necessarily inimical to simultaneous use of the property by ... [the property owners], as long as they did not interfere with defendant's admittedly beneficent activities." *Hendler v. United States,* 11 Cl.Ct. 91, 95 (1986). The court next turned to the question whether a taking by physical occupation had occurred. The court focused on whether the wells were "permanently affixed" to the property and found the record undeveloped on this point. *Id.* at 97.

On appeal the Federal Circuit addressed each issue in turn. The Federal Circuit agreed that the EPA order did not, by itself, constitute a taking. *Hendler,* 952 F.2d at 1375. Nonetheless, the lower court was

faulted for misconceiving the protections underlying the Fifth Amendment:

> The Government does not have the right to declare itself a co-tenant-in-possession with a property owner. Among a citizen's— including a property owner's—most cherished rights is the right to be let alone.

> In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government.

> The notion of exclusive ownership as a property right is fundamental to our theory of social organization. In addition to its central role in protecting the individual's right to be let alone, the importance of exclusive ownership—the ability to exclude freeriders—is now understood as essential to economic development, and to the avoidance of the wasting of resources found under common property systems.

*Id.* at 1374–75 (emphasis in original) (citations omitted). Accordingly, although the EPA order standing alone did not effect a taking, the Federal Circuit left open the question whether "subsequent events," other than a physical occupation, could constitute a regulatory taking under *Penn Central.* *Hendler,* 952 F.2d at 1375.

Turning to the second issue, the Federal Circuit held that, on the record before the lower court, the EPA remediation activity on the property constituted a "permanent physical occupation." *Hendler,* 952 F.2d at 1378. The court opined that " 'permanent' does not mean forever, or anything like it." *Id.* at 1376. The Federal Circuit noted that the taking could be for a limited period: "what is 'taken' is ... an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute...." *Id.* The court emphasized that the wells were "some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement." *Id.* Thus, "[t]here ... [was] nothing 'temporary' about the wells ... installed on plaintiffs' property...." *Id.* Instead, "the term 'temporary' ... logically refers to those governmental activities which involve an occupancy that is transient and relatively inconsequential...." *Id.* at 1377.

The court further explained that a permanent physical occupation need not be "exclusive, or continuous and uninterrupted." *Hendler,* 952 F.2d at 1377. The court reasoned that the intermittent ingress and egress of government agents and employees onto the subject property deprived the property owners of the "right to exclude, for the duration of the period in which the wells are on the property and subject to the Government's need to service them." *Id.* at 1378 (footnote omitted). Accordingly, the court found that the EPA's installation and periodic servicing of the monitoring/extraction wells constituted a permanent physical occupation.

*Hendler* is based solidly upon the principle that the "right to exclude" is a paramount property value, the deprivation of which entitles the property owner to just compensation. 952 F.2d at 1377. " '[W]e hold that the "right to exclude," so universally held to be a fundamental element of the property right, falls within th[e] category of interests that the Government cannot take without compensation....' " *Id.* (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979)). " '[T]he right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property." ' " *Id.* (quoting *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145–46, 97 L.Ed.2d 677 (1987) (quoting other authorities)). A property owner reserves the right to exclude "strangers ... but especially the Government" when the owner does not consent to a physical intrusion. *Hendler,* 952 F.2d at 1374. Concomitantly, a property owner relinquishes the right to exclude when the owner consents to the entry, use, and occupation of the subject property.

Case law thus instructs that the execution of an administrative or court order, although purporting to allow the physical occupation of private property, does not by itself constitute the taking of a compensable property right. *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 801 (Fed.Cir.1993); *Hendler,* 952 F.2d at 1375. When a physical

intrusion does not amount to a permanent physical occupation, but merely a "transient and relatively inconsequential" physical presence, *Hendler,* 952 F.2d at 1377, the broader inquiry under *Penn Central* applies. *Loretto,* 458 U.S. at 435 n. 12, 102 S.Ct. at 3175 n. 12. "The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude...." *Id.* If a property owner has granted permission to another to occupy the subject property, the "right to exclude" has been relinquished and not taken.

### 2. *Sufficiency of complaint*

■ Defendant argues that the complaint is fatally defective because plaintiff improperly alleges a taking based on the district court's mere issuance of an access order. The complaint states:

> On December 16, [1992], the Honorable Marcel Livaudais effected a "taking" of V.J. Scogin, Sr.'s property in Civil Action: 92–3620 styled *United States of America vs. Virgil James Scogin, Sr.,* by Order dated December 16, 1992, and thereafter transferred the action on remand from U.S. Fifth Circuit for damage claims, Section 104(a), CERCLA, 42 U.S.C. Section 9604(a).

Complaint filed Dec. 15, 1994, ¶ II (citation omitted). The complaint further notes that "[t]he activities are estimated to last at least seven years, and the court order constitutes a 'legal usufruct' on ... [plaintiff's] property on a duration of seven years or more, which constitutes a 'taking' under the Fifth Amendment...." *Id.* ¶ IV. The complaint also states that "[t]he above activities render the property 'of no economic value' to ... [plaintiff] as an industrial site, ... and the Order constitutes a legal usufruct and 'taking' of his property by the United States of America, without compensation." *Id.* ¶ VI. Controlling precedent instructs that the mere issuance of an administrative or court order, without more, does not constitute a taking. *Tabb Lakes,* 10 F.3d at 801; *Hendler,* 952 F.2d at 1375. Defendant contends therefore, pursuant to RCFC 12(b)(4), that the complaint does not state a claim upon which relief can be granted.

Were the complaint limited to the quoted allegations, little doubt is raised that defendant would prevail on its motion. *See Tabb Lakes,* 10 F.3d at 801 ("[A]n order of the ... [EPA] directing the plaintiff to allow EPA access to its property in itself did not effect a taking....") (citation omitted). The complaint, however, goes on to summarize the district court's December 16, 1992 order, noting that the EPA is to have complete access to plaintiff's property in order to carry out the CERCLA remediation plan. Moreover, the complaint states: "As a direct and proximate result of the actions of the United [States] of America, ... [plaintiff] has lost the substantial use of his business property for an estimated period of seven (7) years or perhaps longer, without compensation, and has further suffered an encumbrance on his property known as 'legal usufruct'...." Compl. ¶ VII.

These additional averments, if liberally construed, might indicate that government activities subsequent to, and in compliance with, the district court's order form the basis of plaintiff's claim. In *Tabb Lakes* the Federal Circuit noted that subsequent and "pursuant to the order EPA actually invaded the plaintiff's land to install wells. This later action in physically intruding on the plaintiff's property was held to constitute a taking...." 10 F.3d at 801 (citing *Hendler,* 952 F.2d at 1377). Plaintiff's complaint could be construed to plead this alternate theory. Such a reading would render the complaint consistent with a viable takings theory based on the Government's physical invasion or occupation of the property. The difficulty with this construction, however, is that it is strained.

RCFC 8(a) provides that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." Moreover, Rule 8(e) provides that "[e]ach averment of a pleading shall be simple, concise, and direct...." Contrary to RCFC 8, plaintiff's complaint, when read in its entirety, is self-contradictory and confusing. In three instances plaintiff declares that the district court's order constitutes a taking. To laboriously construe the balance

of the complaint to signify otherwise would not serve "the just, speedy, and inexpensive determination of ... [the] action," RCFC 1(a)(2), nor "do substantial justice," RCFC 8(f). The complaint can only be read to plead a viable takings theory by a labor of interpretation that neither this court nor defendant is required to undertake. "[T]here is no 'duty [on the part] of the trial court ... to create a claim which appellant has not spelled out in his pleading....'" *Clark v. National Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir.1975) (quoting *Case v. State Farm Mut. Auto. Ins. Co.*, 294 F.2d 676, 678 (5th Cir.1961)). As the court aptly stated in *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994): "A complaint that is ... confusing makes it difficult for the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation...." (citations omitted).

More problematic is the fact that plaintiff, *pro se*, pleaded his case disingenuously, making no reference to the lease agreement, which appears to constitute a consent to the governmental activity on his property and, at a minimum, would reduce any damages to which he may be entitled. Nor did plaintiff disclose this important fact in moving for summary judgment under RCFC 56(a), which conditions entry of judgment on a claimant's establishing as a matter of fact and law his entitlement thereto. Plaintiff is flirting with RCFC 11 sanctions. They will be imposed unstintingly unless plaintiff perfects his complaint to state a viable claim, taking into account the full effect of the lease agreement.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. By April 24, 1994, plaintiff shall file an amended complaint, with service by overnight mail, to include a more definite statement in accordance with RCFC 12(e). The complaint, as amended to reflect the accurate factual background of this case, will make clear the nature of plaintiff's claim given the lease and the effect of the lease on plaintiff's claim.

2. By May 4, 1995, defendant may either file an answer or supplement its cross-motion for summary judgment, with service by overnight mail. If defendant files a supplement, plaintiff shall respond within the time required by rule.

3. Plaintiff's pending motion for summary judgment will not be the subject of further briefing or court order.

4. The Clerk of the Court shall serve a copy of this order on plaintiff by overnight mail.