**V.J. SCOGIN, Sr., pro se, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–1068L.**

United States Court of Federal Claims.

June 16, 1995.

V.J. Scogin, Sr., Slidell, LA, pro se.

Andrew M. Eschen, Washington, DC, with whom was Asst. Atty. Gen. Lois J. Schiffer, for defendant. John Dugdale, Office of Regional Counsel–Region 6, E.P.A., of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court on cross-motions for summary judgment. Defendant previously moved to dismiss on the basis that a district court order granting the United States access to plaintiff's property did not state a claim for a taking. With its reply and cross-motion, defendant submitted a copy of a lease whereby plaintiff and a government contractor agreed upon compensation to plaintiff for allowing access to the subject property. Before ruling on defendant's motion to dismiss and cross-motion for summary judgment, the court ordered plaintiff to file an amended complaint taking into account the effect of the lease on his claim. The court advised the parties that defendant's cross-motion would be resolved before plaintiff's dispositive motion due to plaintiff's materially incomplete prior filing. *Scogin v. United States*, 33 Fed.Cl. 285 at 293 (1995) (order requiring more definite statement).

Plaintiff's amended complaint failed fully to comply with the court's directive that plaintiff explain the nature of his claim in light of the lease agreement. Thereafter, defendant supplemented its cross-motion for summary judgment, and plaintiff opposed. The sole issue for resolution is whether a taking compensable under the Fifth Amendment of the United States Constitution can be predicated on the Government's intrusion onto property, for which access the landowner is receiving monthly payments pursuant to a lease entered into by his company and a government contractor after a federal court ordered access.

### FACTS

The following facts are undisputed, unless otherwise noted. They replicate the factual recital in the court's earlier order. *Scogin,* 33 Fed.Cl. 285, at 285–90. Additional facts

that have been developed on summary judgment have been included.

Virgil J. Scogin, Sr. ("plaintiff"), owns an industrial parcel of approximately 7.8 acres abutting the Bayou Bonfouca Superfund Site (the "Site"). The Site, an abandoned creosote wood treatment facility located in the City of Slidell, St. Tammany Parish, Louisiana, consists of approximately 53 acres, including nearly 4000 feet of navigable waterway known as the Bayou Bonfouca and its banks. Plaintiff is the President of Standard Materials, Inc., an enterprise involved in the preparation of pre-stressed concrete pilings.

From 1892 to 1970, the Site was operated as a wood treatment facility, which used creosote to treat formed lumber, such as telephone poles and railroad ties. In 1976 the United States Coast Guard discovered creosote in the sediments underlying the Bayou Bonfouca. On September 28, 1983, the Environmental Protection Agency (the "EPA"), pursuant to section 105(a)(8)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9605(a)(8)(B) (1988) ("CERCLA"), placed the Site on the National Priorities List (the "NPL"). The NPL, promulgated at 40 C.F.R. pt. 300, app. B (1994), identifies those sites at which releases or threatened releases of hazardous substances are found to present the greatest threats to public health and the environment. The soil, groundwater, Bayou sediments, and surface waste piles at the Site were found to contain hazardous substances, as defined by section 101(14) of CERCLA, 42 U.S.C. § 9601(14). See 40 C.F.R. § 302.4. Plaintiff's property itself is not contaminated and is not part of the Site.

The EPA conducted numerous public hearings to discuss potential remedial measures for the Site. On March 31, 1987, the EPA issued the Record of Decision. The remedy selected included the excavation and removal of contaminated Bayou sediments. This approach contemplated, among other things, the use of subsurface sheetpiles to support the banks of the Bayou during dredging. Other measures included installing and reading of air monitors and surveying equipment at the Site. In order to carry out these remedial measures, the EPA required access to plaintiff's property. 42 U.S.C. § 9604(a)–(b).

On a date that does not appear in the record, plaintiff requested a meeting with EPA representatives to discuss the impact of the proposed remedial action on plaintiff's barge-docking area. By letter dated February 26, 1987, Kathleen O'Reilly, a geologist with EPA Region VI (later Region 6) in Dallas, Texas, declined plaintiff's request. Ms. O'Reilly noted: "We will certainly work with you on this problem and have no intention of rendering your company unable to perform contracted work...." Ms. O'Reilly explained, however, that until the remedial plans were more fully developed and the actual impact of such plans on plaintiff's docking area was known, a meeting would be premature.

On April 28, 1988, Bren Bishop, Vice President and General Manager of Administration of Standard Materials, signed a document purporting to allow the EPA to enter the subject property in order to conduct an environmental investigation. The purpose of the investigation was to allow the EPA to evaluate the extent of chemical contamination on the subject and nearby property. The document, titled "PERMISSION TO ENTER PREMISES FOR ENVIRONMENTAL INVESTIGATION," listed various permissible activities, including using heavy equipment to drill holes; taking of soil, water, and air samples; and installing monitoring wells. The EPA was required to remove "all material and equipment ... from the property," with the exception of the monitoring wells. The EPA was also required to restore the property "as nearly as possible to its original state and condition following these activities." The term of the agreement was 60 months from the effective date of the instrument, a period of five years beginning on April 28, 1988.

On September 15, 1988, Mr. Bishop signed a document titled "CONSENT FOR ACCESS TO PROPERTY." This document purported to grant the EPA access to plaintiff's property for the purpose of taking subsurface soil and water samples. The term of this agreement was two months beginning on

the date the document was signed, September 15, 1988. The agreement provided that "written permission is given by [the signatory] voluntarily with knowledge of [the signatory's] right to refuse and without threats or promises of any king [sic]."

The record reveals that the U.S. Army Corps of Engineers (the "Corps") in early 1989 had occasion to use a docking facility belonging to plaintiff and located on the subject property. The use of plaintiff's dock was apparently in connection with the CERCLA remediation effort. By letter dated March 31, 1989, Paul D. Barber, Chief, Corps Engineering Division, informed plaintiff that government agents "reported that [plaintiff's] docking facility was quite adequate for all their purposes in the safe loading and unloading of drill equipment and personnel. . . ." The letter concludes by thanking plaintiff for the use of his docking facility and by expressing appreciation for his "generous assistance."

On June 27, 1989, Mr. Bishop signed another consent agreement, granting the EPA access to plaintiff's property for the "installation and reading of such survey markers as is determined necessary." The term of this agreement was 60 months from the date the instrument was signed. As with the previous consent form, this agreement provided that permission to enter plaintiff's property for the stated purpose was granted voluntarily, with full knowledge of the signatory's right to refuse and "without threats or promises of any kind."

On October 16, 1989, Robert M. Griswold, Remedial Project Manager, EPA Region 6, contacted plaintiff regarding the drilling of subsurface borings on plaintiff's property. By letter dated October 17, 1989, Mr. Griswold informed Mr. Bishop that the EPA "and its contractors will coordinate all locations of these borings with you or your authorized representative." Mr. Griswold enclosed another consent agreement for Mr. Bishop's signature. This form purported to allow access to plaintiff's property for, among other things, the installation of equipment necessary to support sheetpiling or other slope stabilization structures. The form indicated that "[t]he term of this agreement shall cease 7 years from the date of which the instrument herein was signed by the owner(s). . . ." Plaintiff did not sign this document.

On October 18, 1989, Mr. Bishop, on behalf of Standard Materials, signed a similar form, which differed from the original in two respects. First, the "purposes" in the original form were replaced with the following: "1. The taking of such soil samples as are determined necessary to investigate the subsurface materials." Second, the stated term of the agreement was two months, not seven years. Plaintiff signed this document on October 18, 1989. In late 1989 and early 1990, the EPA took soil borings from plaintiff's property.

The record indicates that by letter dated August 20, 1990, plaintiff contacted Ben J. Harrison, Assistant Regional Counsel, EPA Region 6, to inquire about the effects of the remedial work being conducted at the Site. On November 1, 1990, Mr. Harrison advised plaintiff by letter that, if he did not consent to EPA access to his property, the EPA was authorized to issue an administrative order pursuant to 42 U.S.C. § 9604(e), granting itself access to the property.

On June 18, 1991, EPA Region 6 issued an order pursuant to CERCLA, 42 U.S.C. § 9604(e)(5), requiring plaintiff to allow the EPA access to his property. Plaintiff filed a complaint in the United States District Court for the Eastern District of Louisiana. *V.J. Scogin, Sr. v. United States EPA Region 6 et al.*, Civ. A. No. 91–2753, (E.D.La., filed July 27, 1991). Alleging an unconstitutional taking, plaintiff sought both permanently to enjoin the EPA from entering his land and money damages. On January 14, 1992, the district court granted the United States' motion to dismiss, ruling that CERCLA, 42 U.S.C. § 9613(h), precludes judicial review of EPA remediation activities until the EPA itself brings an enforcement action. The district court also held that it lacked jurisdiction to award plaintiff monetary damages, since a takings claim in excess of $10,000.00 is within the exclusive jurisdiction of the United States Court of Federal Claims. Plaintiff then appealed the district court's order to the United States Court of Appeals for the Fifth

Circuit. *See Scogin v. Region 6 Environmental,* 987 F.2d 771 (5th Cir.1993) (Table).

Plaintiff filed a "Petition for Review" in the United States Court of Appeals for the District of Columbia Circuit. *V.J. Scogin, Sr. v. EPA,* No. 91–1341 (D.C.Cir., filed July 19, 1991). Plaintiff challenged the same "Unilateral Administrative Order" that was the subject of the district court action. On September 17, 1991, the United States filed a motion to dismiss. On March 22, 1992, the D.C. Circuit stayed proceedings pending disposition of plaintiff's appeal to the Fifth Circuit.

While the appeal to the Fifth Circuit was pending, the United States filed a complaint together with a Motion for an Immediate Order in Aid of Access in the United States District Court for the Eastern District of Louisiana. *United States v. V.J. Scogin, Sr., et al.,* Civ. A. No. 92–3620 (E.D.La., filed Nov. 3, 1992). On December 17, 1992, the district court entered an order authorizing access to plaintiff's property. The order stated that the EPA

> shall have complete access to ... [plaintiff's] property for the purpose of effectuating remedial actions, at the Bayou Bonfouca Superfund Site, that the EPA deems necessary to address the threat to human health and the environment posed by the release or potential release of hazardous substances. The EPA shall have access for a time that is reasonably necessary to complete such activities[.]

The order further stated that plaintiff was

> enjoined from in any way interfering with the access of the EPA ... to ... [plaintiff's] property for the above stated purposes, including the installation and reading of air monitoring equipment, the installation and maintenance of subsurface sheetpiling anchors or other slope stabilization methods, and any other actions necessary to carry out the cleanup remedy selected by the EPA[.]

The order also stated that plaintiff "may be assessed civil penalties under 42 U.S.C. § 904(e)(5) of up to $25,000.00 per day for future noncompliance with this Order...."

The EPA and the Corps entered into a cooperative agreement pursuant to which the Corps was to perform an oversight function at the Site. On February 18, 1993, Standard Materials entered into a lease agreement with the principal remedial contractor for the EPA at the Site, IT–OHM, a Joint Venture, for two parcels of land owned by plaintiff adjacent to the Site. The agreement concerning two parcels constitute approximately four acres out of a larger tract of land defined at "Entry 548670" in a land recordation book describing the sale of approximately 7.8 acres of land by the Alabama Great Southern Railroad Company to plaintiff.

The lease agreement contains the following provisions:

> *ARTICLE 2.* IT–OHM, A Joint Venture will use said Premises for purpose of temporarily storing materials, equipment and parking vehicles for their use.

> *ARTICLE 3.* IT–OHM, A Joint Venture will pay unto Standard Materials, Inc. as rent the sum of TWENTY FOUR THOUSAND ... ($24,000.00), payable monthly in advance in installments of $2,000.00 per month, beginning as of the *1st* day of *February, 1993,* which is the effective date hereof.... This agreement shall not be subject to termination by Standard Materials, Inc. unless IT–OHM, A Joint Venture has defaulted hereunder. However, IT–OHM, A Joint Venture shall have the option to terminate this Lease should its contract with the United States Army Corps of Engineers be terminated for any reason. Upon the end of the lease term, IT–OHM, A Joint Venture, at its option, may continue the lease term on a month to month basis for the $2,000.00 per month until terminated in writing by Standard Materials, Inc.

> ....

> *ARTICLE 5.* IT–OHM, A Joint Venture shall pay, satisfy, and discharge all claims, judgements, and liens for material and/or labor, used or employed by IT–OHM, A Joint Venture or its agents in the construction, repair, maintenance or removal of any buildings or structures located upon the Premises, whether the buildings or structures shall, under the terms of this agreement, be the property of Standard Materials, Inc. or IT–OHM, A Joint

Venture, and IT–OHM, A Joint Venture shall indemnify and save harmless Standard Materials, Inc., its officers, agents and employees, from all such claims, judgments, liens or demands whatsoever.

....

*ARTICLE 15.*

....

(b) Upon the termination of this agreement, for what ever [sic] cause, IT–OHM, A Joint Venture will vacate the Premises immediately, remove all improvements owned or placed thereon by IT–OHM, A Joint Venture, and leave the Premises, including the subsurface, in as good order and condition as said premises may have been prior to the use and occupation thereof by IT–OHM, A Joint Venture and free from holes, obstruction, debris, waste, or contamination caused by waste introduced by IT–OHM, A Joint Venture, of any kind;

(c) If IT–OHM, A Joint Venture fails to restore the Premises as provided herein prior to the date the IT–OHM, A Joint Venture is required to vacate such premises, then Standard Materials, Inc. may, at its option but at the sole cost and expense of IT–OHM, A Joint Venture, remove or arrange to remove all such property, improvements, obstructions, debris, waste, and contamination by substances brought onto the Premises by IT–OHM, A Joint Venture, and restore or arrange to restore both the surface and subsurface of the Premises to as good order and condition as said Premises may have been prior to the use and occupation thereof by IT–OHM, A Joint Venture excepting that contamination surface or subsurface conditions existing as a result of preexisting substances, materials, or hazardous conditions. Promptly upon billed [sic] rendered by Standard Materials, Inc., IT–OHM, A Joint Venture shall pay to Standard Materials, Inc. the total cost of such removal and restoration, including, but not limited to, the cost of cleaning up and removing any contaminated soil or water.

....

*ARTICLE 17.* In addition to any other rights of entry reserved herein, Standard Materials, Inc. reserves unto itself and its permittees the right to enter upon said Premises at any time for operation, maintenance, reconstruction, repair, or relocation of any building, trackage, or other structures located on said Premises; for inspection of the Premises; for taking whatever corrective actions the Standard Materials, Inc. deems necessary to eliminate any violation of articles 6, 7, 8, and 9 if, in the Standard Materials, Inc.'s judgment, the steps taken by IT–OHM, A Joint Venture are inadequate or not timely; and for any other lawful purpose. Standard Materials, Inc. shall use its best efforts not to interfere with IT–OHM, A Joint Venture's use of the Premises during such entry.

On March 1, 1993, the Fifth Circuit affirmed, in part, without opinion, the district court's dismissal of the complaint. *Scogin v. Region 6 Environmental,* 987 F.2d 771, but vacated that portion of the district court's order refusing to transfer the complaint to the Court of Federal Claims. On March 24, 1993, the district court entered an order transferring plaintiff's claim for monetary damages.

By letter dated March 31, 1993, Charles E. Peel, Contract Administrator at IT–OHM, and P.J. Ives, Project Director of IT–OHM, informed the Corps that IT–OHM had entered into a lease agreement with Standard Materials. The letter and the attached lease agreement were provided "to document that IT–OHM does have legal written permission to use the property, and to make the USACE [the Corps] aware that [the] property will be used basically as a parking, lay down and support area." The remedial activities of IT–OHM have been restricted to the approximately 4 acres that were leased. The parties dispute the extent to which plaintiff has access to the leased property. Defendant asserts that plaintiff has never been denied access to the leased portion of the property. Plaintiff counters that he is denied access to the leased property because he has no key to the gate installed by IT–OHM at the property line. By letter dated May 12, 1994, to Mr. Griswold, the EPA Project Manager, Mr. Scogin stated: "I am as always very much in

favor of retaining the steel piling on my Bayou Bonfouca property."

The proceedings in the Court of Federal Claims to date were set forth in *Scogin*, 33 Fed.Cl. 285, at 289–90. On April 26, 1995, plaintiff, pursuant to court order, filed his First Amended Complaint. The court's order expressly instructed plaintiff to describe his claim, taking into account the effect of the lease agreement. The Amended Complaint revised paragraphs V and VIII of the initial complaint, re-alleged paragraphs I–IX, and supplemented these with 21 additional allegations. Paragraph XIII of the Amended Complaint contains the following single reference to the lease agreement:

> At all times material to this complaint, plaintiff, V.J. Scogin, Sr. had no lease for Parcels I and II with the United States of America; its contractors; subcontractors; nor the United States Army Corps of Engineers.

The Amended Complaint also introduces a number of allegations concerning plaintiff's docking facility. Plaintiff alleges that the Corps in early 1988 moored a barge to plaintiff's dock without his consent for the purpose of rigging the barge with drilling equipment. *Id.* ¶¶ XIV–XV. He first became aware of the Corps' use of his dock when he visited the premises and observed vehicles and equipment near the dock bearing the "Corps" logo. *Id.* ¶ XVI. According to plaintiff, the barge was moored at his dock for "a number of weeks." *Id.* ¶ XV. Plaintiff avers that the Corps used his dock and premises as a "base of operations until the work was completed...." *Id.* ¶ XVII.

The Amended Complaint also contains several allegations purporting to describe the effect of sheetpiling on the dock. *Id.* ¶¶ XXI–XXVI. EPA "contractors partially demolished [his] dock and effected a 'Taking,' permanent in nature, by closing off the dock from the water, ..." thereby rendering the dock inaccessible to barge traffic. *Id.* ¶ XXI. Plaintiff alleges that EPA contractors did not install sheetpiling on his property, but on "Louisiana State water bottoms, an arm of the sea." *Id.* ¶ XXIII. The purpose of the sheetpiling was not to protect his dock or otherwise to improve his property, but to prevent the banks of the Bayou Bonfouca from collapsing during the CERCLA remediation. *Id.* ¶¶ XXII, XXIV. Plaintiff adds that the area between his property and the sheetpiling "is approximately 22 feet." *Id.* ¶ XXVI. "[T]he sheetpiling could not be removed due to the fact that the bank would slough into Bayou Bonfouca effecting a complete taking of all [plaintiff's] property to the railroad, by dereliction." *Id.* ¶ XXV.

Plaintiff further alleges that, prior to 1988 and without his permission, EPA contractors conducted drilling operations on his property "by mistake." *Id.* ¶ XVIII. He met with EPA officials on or about April 1988 to execute an agreement allowing the EPA to "complete the testing, with consent." *Id.* ¶ XVIX. According to plaintiff, the test wells to date "have not been filled to their original condition," and that employees of Standard Materials inadvertently bulldozed pipes protruding from the test wells. *Id.* ¶ XX.

The Government, after issuance of the district court's access order on December 17, 1992, allegedly used plaintiff's property "to stage material and prefabricate the facility parts utilized in the assembly remediation project, as a field construction site with contruction [sic] office." *Id.* ¶ XXIX. Plaintiff avers that the Government also used his property to "facilitate the only access to the bayou cleanup site for the purpose of loading and unloading barges and the staging of marine equipment, ... installing water and power lines; and storing oxygen and acetylene tanks." *Id.* ¶ XXX.

In a supplement to its cross-motion for summary judgment, defendant argues that the Amended Complaint fails to satisfy the court's order that plaintiff provide a more accurate factual background to the case and to clarify the nature of his claim in light of the lease. Defendant charges that plaintiff disingenuously attempts to diminish the import of the lease to his takings claim by advancing that Standard Materials, and not plaintiff, entered into the agreement. According to defendant, the distinction between Standard Materials and plaintiff is immaterial, particularly because Standard Materials is solely owned by plaintiff and it was plaintiff

who signed the lease. Having chosen to enter into a lease and having negotiated the terms of the lease, plaintiff cannot now complain that his property has been taken. Defendant maintains that plaintiff has failed to demonstrate a genuine issue of material fact concerning plaintiff's alleged consent to government intrusion on the subject property.

Plaintiff has submitted even more filings, notable for their opacity and confusion, to which defendant has responded. It should be noted that plaintiff has inundated the record with marginal filings. As a *pro se*, plaintiff need not plead like a lawyer, *Roche v. USPS*, 828 F.2d 1555, 1558 (Fed.Cir.1987), and the court has plumbed his filings to ascertain not only whether he "has a cause of action somewhere displayed," *Ruderer v. United States*, 188 Ct.Cl. 456, 468, 412 F.2d 1285, 1292 (1969), *cert. denied*, 398 U.S. 914, 90 S.Ct. 1716, 26 L.Ed.2d 77 (1970), but what exactly the claim is that plaintiff pursues so ardently. The court's duty to indulge an individual proceeding *in propria persona* must be tempered by the burden imposed on the opposing party represented by an attorney, who is required to respond to meandering, inscrutable, argumentative, and disingenuous pleadings. Plaintiff emphasizes repeatedly his age (80), but the law cannot excuse plaintiff's heaping travail on his opponent either out of concern for plaintiff's acting as his own lawyer or being a senior citizen. Plaintiff has been extended all the latitude to which he is due. If he cannot press his claims intelligibly, he should abandon them. Correspondingly, the court advises plaintiff that his license to plead contradictory or inaccurate factual positions has expired. RCFC 11 sanctions will be applied in the future.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Due to the ad hoc nature of takings inquiries, the issues involved are normally fact issues that must be determined either on the entirety of a complete record or at trial. *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1560 (Fed.Cir.1985); *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 891 (Fed.Cir.1983). The harsh finality of summary judgment also dictates "its application must be accompanied by great care in respect of the entire record and the relevant law...." *Yuba*, 723 F.2d at 891. In *Celotex* the Supreme Court stated:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof....

477 U.S. at 322–23, 106 S.Ct. at 2552–53. An opponent of summary judgment "must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant...." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984); *see Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984). Argument and assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact.

*Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed.Cir.1984). If defendant submits an affidavit on a material point, plaintiff must respond with an affidavit. *See Royal Indem. Co. v. United States*, 178 Ct.Cl. 46, 51, 371 F.2d 462, 465, *cert. denied*, 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967). Nonetheless, an opponent of summary judgment is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Plaintiff submits a takings claim that must be deciphered in order to be understood. On December 17, 1992, the United States District Court for the Eastern District of Louisiana entered an order granting the EPA access to plaintiff's property in order to carry out the CERCLA remediation plan. Plaintiff claims that at this "point in time ... the Federal Court granted the United States of America a *legal usufruct* on the property of V.J. SCOGIN, SR., and the United States of America physically occupied Parcels I and II *prior* to the arrival of IT–OHM at the Bayou Bonfouca Superfund Site, Slidell, Louisiana, since 1988." Plf's Br. filed May 9, 1995, at 2 (emphasis in original). A "legal usufruct" is a property interest peculiar to Louisiana law that, generally speaking, comprises all sticks in the bundle of rights known as property other than ownership. The gravamen of plaintiff's takings claim is that the district court's order granting the EPA access to the subject property divested plaintiff of all rights in his property other than "naked ownership," and particularly deprived plaintiff of the "right to exclude." *Id.* at 2, 3. Plaintiff attempts to synthesize this theory with the claim that the EPA, to greater and lesser degrees, has physically occupied the subject property throughout the EPA's remediation effort, a time period beginning in 1988.

### 1. *A taking of the usufruct*

Under Louisiana law a "usufruct" is "a real right of limited duration on the property of another...." La.Civ.Code Ann. art. 535 (West 1980). A "[u]sufruct may be established by a juridical act either inter vivos or mortis causa, or by operation of law...."

La.Civ.Code Ann. art. 544. "The ownership of a thing burdened with a usufruct is designated as naked ownership." La.Civ.Code Ann. art. 478. A "usufructuary has the right to possess ..." the subject property and "to derive the utility, profits, and advantages that [the subject property] may produce, under the obligation of preserving their substance." La.Civ.Code Ann. art. 539; *see Clarke v. Brecheen*, 387 So.2d 1297, 1301 (La.Ct.App.1980) (usufructuary "has two basic rights—the right to possess, use and enjoy the property and the right to receive the fruits produced by the property.") Plaintiff contends that the district court's order transferred to the EPA both the usus and the fructus of the subject property, thereby depriving plaintiff of a compensable property interest. "Once access was involuntarily alienated by the Federal Court, the 'right to exclude' was alienated by Federal Court Injunction, and plaintiff was divested of his Fifth Amendment, Right to Exclude on his property." Plf's Br. filed May 9, 1995, at 4.

■ The extent to which the district court's order implicates the Fifth Amendment need not be looked at through the lens of Louisiana property law. Authority binding upon the court holds that an administrative or court order, without more, does not constitute a taking under the Just Compensation Clause. In *Hendler v. United States*, 952 F.2d 1364, 1375 (Fed.Cir.1991), the Federal Circuit held that an EPA order granting access to a landowner's property did not, by itself, constitute a taking. Rather, the court held that the question whether a compensable taking has occurred would turn upon events "subsequent" to the effective date of the order. *Id.; Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 801 (Fed.Cir.1993). An order purporting to allow the EPA to enter upon and use private property does not affect the owner's interests in that property until the EPA acts in accordance with the order. The court order in this case, like the administrative order in *Hendler*, does not deprive plaintiff of a compensable property right.

■ Even were this court to accede to plaintiff's claim that the district court order constitutes a "usufruct" under Louisiana law,

it would bear little constitutional relevance to this case. A usufructuary entitled to the use and occupation of another's property does not deprive the naked owner of a compensable property interest unless and until the rights of the usufructuary are acted upon. *See, e.g., Bell v. Saunders,* 139 La. 1037, 72 So. 727, 730 (1916) ("[T]he usufructuary must ordinarily occupy the land, to the exclusion of the owner in order to enjoy his right of usufruct, ..."). It is only when the rights of the usufructuary are exercised that a viable takings claim arises. The concepts of "usufruct" and "usufructuary" merely describe the permissible uses by one entity of another's property. As such, they have as little relevance to the constitutional calculus as an administrative or court order purporting to allow the use and occupation of another's property. Where the alleged usufruct involves the right to use and occupy private land, it is the subsequent act, *i.e.,* the physical use and occupation of the land, that bears upon the question whether a Fifth Amendment taking has occurred.

### 2. *Physical occupation*

In *Hendler,* the Federal Circuit addressed the question whether the EPA's physical intrusion onto private property constituted a taking. In that case the EPA undertook a broad-ranging CERCLA remediation plan designed to combat groundwater contaminants from the Stringfellow Acid Pits, a major hazardous waste site in California. The remediation strategy required the EPA, in conjunction with the state, to monitor the flow of contaminated groundwater on nearby properties. The EPA sought permission to enter a nearby property in order to install a series of wells. The owner refused. The EPA then issued an order granting itself access to the owner's property for the purpose of " 'locating constructing, operating, maintaining, and repairing monitor/extraction wells.' " *Hendler,* 952 F.2d at 1369 (quoting EPA Order, Sept. 20, 1983). Subsequently, the EPA installed five wells on the owner's property; the State of California, 13.

The Federal Circuit held that, on the record before the trial judge, the EPA remediation activity on plaintiff's property constituted a "permanent physical occupation." *Hendler,* 952 F.2d at 1378. The court emphasized that the wells were "some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement." *Id.* Thus, "[t]here ... [was] nothing 'temporary' about the wells ... installed on plaintiff's property...." *Id.*

The court further explained that a permanent physical occupation need not be "exclusive, or continuous and uninterrupted." *Id.* The court reasoned that the intermittent ingress and egress of government agents and employees onto the subject property deprived the property owners of the "right to exclude, for the duration of the period in which the wells are on the property and subject to the Government's need to service them." *Id.* at 1378 (footnote omitted). A property owner reserves the right to exclude "strangers ... but especially the Government" when the owner does not consent to a physical intrusion. *Hendler,* 952 F.2d at 1374. Concomitantly, a property owner relinquishes the right to exclude when the owner consents to the entry, use, and occupation of the subject property.

The present record indicates that governmental agents entered upon plaintiff's property sometime in 1988 as part of the CERCLA remedial program. The record also indicates that governmental activity on plaintiff's property is scheduled for completion in June 1995. Declaration of Harvey L. Morgan, ¶ 22, Apr. 3, 1995. An alleged taking need not be of infinite duration in order to be permanent. *Hendler,* 952 F.2d at 1376 (" '[P]ermanent' does not mean forever, or anything like it...."). The timeframe in this case, 1988–1995, represents the outer limits of the alleged taking by physical occupation.

### 1) *Events prior to district court's access order*

Plaintiff argues that during the years 1988–1989 the EPA through its employees and contractors physically occupied the property to effect groundwater borings and extractions without his knowledge and consent. These activities were undertaken pursuant to CERCLA, 42 U.S.C. § 9604(e)(1)(A), (B), which authorizes government officials to en-

ter upon property bordering a hazardous waste facility in order to inspect the premises and where appropriate to obtain samples of hazardous substances. Defendant does not dispute that groundwater borings and extractions occurred, but contends that plaintiff consented to these activities.

Defendant points to several documents signed by Bren Bishop, an authorized representative of Standard Materials, expressly granting permission to the EPA to undertake various activities on plaintiff's property. A document titled "PERMISSION TO ENTER PREMISES FOR ENVIRONMENTAL INVESTIGATION," dated April 28, 1988, listed as permissible activities the drilling of holes for subsurface investigation, including the use of heavy equipment, such as trucks and drilling rigs, and the taking of soil, water, and air samples. The document also allowed the installation of monitoring wells. The document contained a caveat that plaintiff's property would be restored "as nearly as possible" to its original condition following these activities. The agreed-upon time period during which these activities could take place was 60 months, or five years. A second document, signed by Mr. Bishop on June 27, 1989, granted the EPA permission to install and monitor survey markers on plaintiff's property. The agreed-upon time period for these activities was again 60 months.

■ Plaintiff fails to demonstrate that the EPA undertook activity on his property beyond the scope of valid agreements granting the Government access to the subject property for specified purposes. Plaintiff therefore fails to establish a genuine issue of material fact that he did not consent fully to the EPA presence on his property. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (moving party entitled to judgment as a matter of law where "the nonmoving party has failed to

make a sufficient showing on an essential element of its case. . . .").[1]

■ Plaintiff next argues that the Corps used his docking facility without permission in 1988. The record indicates that on March 31, 1989, the Corps' Paul D. Barber, Chief, Engineering Division, contacted plaintiff by letter. The letter described the use of the dock including the loading and unloading of drilling equipment from a barge. It is unclear whether plaintiff's dock was being used in conjunction with permissible activities, such as the aforementioned drilling of test wells, or in conjunction with other activities to which plaintiff may or may not have consented. The letter concludes by thanking plaintiff for the use of his dock and by expressing appreciation for plaintiff's "generous assistance." The tenor of this correspondence indicates that plaintiff acquiesced in the use of his dock.

Even if plaintiff had not granted the Corps permission to use his dock, the use described above and in the Amended Complaint would not amount to a taking. Plaintiff alleges that the Government barge was moored at the dock "for a number of weeks." Amended Compl. ¶ XV. However, plaintiff does not allege, let alone demonstrate, that he was precluded from using the dock during this period, or that the Corps' use of the dock interfered with plaintiff's use of his property. The intermittent use of plaintiff's dock for loading and unloading equipment for a limited time is "transient and relatively inconsequential, and thus properly can be viewed as no more than a common trespass *quare clausum fregit.*" *Hendler*, 952 F.2d at 1377. Plaintiff has not established a Fifth Amendment taking based on the physical use and occupation of his dock.

### 2) *Events subsequent to district court's access order*

Plaintiff argues that the Government occupied his property pursuant to the December

---

1. Plaintiff alleges that at an unspecified time prior to 1988 the EPA, through its contractors, drilled test wells on his property "by mistake." Amended Compl. ¶ XVIII. It is well settled, however, that unauthorized government activity does not work a taking. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898–99 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Government misconduct

that does not arise under color of statute or regulation may give rise to a due process claim or sound in tort. *See Tabb Lakes*, 10 F.3d at 802–803. Moreover, plaintiff avers that the activity took place *"prior* to April 1988." Amended Compl. ¶ XX (emphasis in original). Since plaintiff's action was commenced on December 15, 1994, the six-year statute of limitations bars this claim. 28 U.S.C. § 2501 (1988 & Supp.1993).

17, 1992 district court access order. In 1989 the EPA had sought plaintiff's permission to enter upon his property to install slope stabilization structures, including sheetpiling as part of its plan to dredge the Bayou Bonfouca. Plaintiff refused. The United States subsequently filed a complaint in the Eastern District of Louisiana requesting an Immediate Order in Aid of Access. *United States v. V.J. Scogin, Sr., et al.,* Civ. A. No. 92–3620 (E.D.La., filed Nov. 3, 1992). The district court granted the EPA access to plaintiff's property for, among other things, "the installation and maintenance of subsurface sheetpiling anchors or other slope stabilization methods, and any other actions necessary to carry out the cleanup remedy...."

Plaintiff specifically alleges that subsequent to the access order, agents of the Government "utilized [plaintiff's] property ... to stage material and prefabricate the facility parts utilized in the assembly remediation project, as a field construction site with contruction [sic] office." Amended Compl. ¶ XXIX. Plaintiff also alleges that agents of the Government used his property "for the purposes of loading and unloading barges and the staging of marine equipment, as a base operation prior to; and continuing to date, installing water and power lines; and storing oxygen and acetylene tanks." *Id.* ¶ XXX.

Defendant does not dispute that the Government contractor, IT–OHM, used and occupied plaintiff's property for the purposes specified in the district court's access order. Rather, plaintiff consented to the Government's incursion onto his property by entering into a lease with IT–OHM under which the former receives $2,000.00 per month in rent for the use and occupation of approximately four out of a total of 7.8 acres, for remedial purposes. Defendant argues that plaintiff was not obligated by the district court's access order to enter into a lease agreement with a government contractor.

According to defendant, having chosen to enter into the lease, and having negotiated the terms of the lease, including the compensation to be paid, plaintiff cannot now be heard complaining that the Government has worked a taking by physically occupying his land.

■ Defendant takes the position that the lease agreement is analogous to the consent agreements previously entered into by plaintiff. Defendant's argument would have merit had the lease agreement been executed prior to the district court's access order. Although plaintiff's decision to enter into the lease was voluntary, the lease does not represent plaintiff's consent to the use and occupation of his property, because the access order already had deprived plaintiff of the power to consent. A material distinction exists between a consent form freely entered into and a lease agreement entered into that contemplates activities on plaintiff's property which, but for the district court's access order, plaintiff would not have allowed. " 'This element of required acquiescence is at the heart of the concept of occupation.' " *Yee v. City of Escondido,* 503 U.S. 519, 527, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (1992) (quoting *FCC v. Florida Power Corp.,* 480 U.S. 245, 252, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282 (1987)). The Supreme Court in *Florida Power* acknowledged that a statute (or order) compelling a landowner over his objection to rent his property may amount to a taking by physical occupation. 480 U.S. at 251–52 n. 6, 107 S.Ct. at 1111–12 n. 6; *see also Yee,* 503 U.S. at 528, 112 S.Ct. at 1529. In this case the district court order authorized a mandatory physical occupation of plaintiff's property. Government compulsion was present.

■ The quantum of government activity on plaintiff's land during the period in which the lease is in effect is substantial enough to work a *Hendler*-type taking. 952 F.2d at 1374.[2] The question whether plaintiff is enti-

---

2. Plaintiff argues that the installation of sheetpiling on the Bayou Bonfouca waterbottom impedes access to his dock. Amended Compl. ¶¶ XXI–XXIV. Long-standing precedent holds that the United States, as the owner of the navigable servitude, may deny access to navigable waters without paying compensation to the ripar-

ian owner. *United States v. Cherokee Nation,* 480 U.S. 700, 704, 107 S.Ct. 1487, 1490, 94 L.Ed.2d 704 (1987) ("[T]he damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the riparian owners' interests are subject."). More-

tled to just compensation, however, is complicated by the remuneration plaintiff has received, and continues to receive, under the lease.

■■■■ Where property is taken by physical occupation, just compensation is calculated at the fair rental value of the property over the period of the tenancy. *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1580 (Fed.Cir.1990). The question thus becomes whether the $2,000.00 per month received by plaintiff under the lease represents the fair rental value of the property occupied. Plaintiff bears the burden of demonstrating that compensation received for the use and occupation of his property is not constitutionally sufficient. *See Hendler*, 952 F.2d at 1382.[3] It is defendant's burden to establish that a landowner forfeits his right to claim compensation for a taking if he has accepted any payment for the use of the property. Thus, the fact that plaintiff entered the lease after the court order negates presumptive consent, but nonetheless could amount to a waiver.

## CONCLUSION

This case cannot be resolved by allowing defendant discovery to respond to plaintiff's motion for summary judgment. The accuracy and integrity of plaintiff's filings on his motion are suspect. The more prudent course is to allow defendant to conduct discovery, as it has requested, and for the court to set a course of further proceedings after having obtained the parties' suggestions. Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is granted, insofar as plaintiff's claim

has been limited, and otherwise is denied. Plaintiff's takings claim, in the nature of a claim for a temporary physical taking, is limited to that portion of plaintiff's property governed by the lease agreement between plaintiff and IT–OHM.

2. Plaintiff may not amend further his complaint to expand or otherwise alter the scope of the alleged taking.

3. Defendant shall answer the amended complaint by June 30, 1995.

4. All discovery on liability and damages shall be completed by September 30, 1995.

5. A status conference shall be held at 2:30 p.m. on October 5, 1995, in the National Courts Building, 717 Madison Place, N.W., Washington, DC. Plaintiff may participate by telephone conference call to be placed by the court. The parties shall be prepared to propose a schedule for further proceedings.

over, the record indicates that plaintiff informed the EPA that he did not want the sheetpiling removed. Plaintiff stated in his May 12, 1994 letter to the EPA Project Manager: "I am as always very much in favor of retaining the steel piling on my Bayou Bonfouca property."

3. Plaintiff further argues that his dock has been "partially demolished." Amended Compl. ¶ XXI. Defendant disagrees. *See* Morgan Decl. ¶ 15.
   Plaintiff also appears to argue that he was forced by the EPA remediation effort to relocate a portion of his business. Plaintiff states that he "was obligated to have hundreds of thousands of dollars in materials made in Mobile, Alabama and transported back by barge—a 300 mile round trip, during the period of our shut down of operations in moving the old site to the new site." Affidavit of V.J. Scogin, Sr., unnumbered ¶, May 2, 1995. A landowner, however, is not entitled to compensation under the Fifth Amendment for consequential damages, such as relocation expenses. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 11–12, 69 S.Ct. 1434, 1440–41, 93 L.Ed. 1765 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372, 377–78, 66 S.Ct. 596, 599–60, 90 L.Ed. 729 (1946).