**Henry HENDLER, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 456–84L.**

United States Court of Federal Claims.

Oct. 9, 1996.

As Amended on Reconsideration
Nov. 26, 1996.

---

3. *See supra* note 1.

Paul R. Hamilton, Los Angeles, CA, for plaintiffs.

David F. Shuey, Washington, DC, for defendant Eric S. Gould, Justice Department, Washington, DC, and Laurie J. Williams, Environmental Protection Agency, San Francisco, CA, of counsel.

## OPINION

ROBINSON, Judge:

This case is before the court after trial, which was held in various locations in southern California in 1995.

### Findings of Fact

The plaintiffs own, either individually or as trustees, approximately 97.3 acres of land ("plaintiffs' property" or "the subject property") in an unincorporated region of western Riverside County, California, commonly known as the Jurupa district. Specifically, plaintiffs' property lies on the north and south sides of State Highway 60 (a/k/a the Pomona Freeway), one of the major freeways connecting Los Angeles with its eastern suburbs. The property below Highway 60 is 41 acres bordered on the south side by Mission Boulevard, one of the main thoroughfares leading into the city of Riverside. On the west side, north and south of Highway 60, the property is bordered by Pyrite Street,

which is connected to the freeway by entry and exit ramps. The property below the freeway is further divided into two major parts by a county-owned flood control channel, called the Pyrite Channel after Pyrite Canyon, which lies north (and upgradient) of the property.[1] After cutting across the subject property below the freeway, Pyrite Channel runs through a semirural residential community known as Glen Avon. The property occupied by the channel was part of plaintiffs' original holdings but was condemned for the purpose of constructing the channel in 1974.

The subject property was first acquired by Paul Garrett in 1960, but the current ownership of the property is the result of a series of transfers, all recorded in deeds on file in Riverside County. Shortly after purchasing the property in 1960, Mr. Garrett transferred his interest in it to his mother and father, Tillie and Max Goldring. The Goldrings then transferred an undivided ¼ interest in the property to Henry Hendler (who was married to Paul Garrett's sister) and another undivided ¼ interest to Irving Gronsky and his wife, who were family friends. The Goldrings then transferred the remaining ½ undivided interest in the property back to Mr. Garrett. Messrs. Gronsky and Hendler have retained their respective undivided quarter interests, but Mr. Garrett's undivided half interest was transferred first to an entity called Garden Grove Farms and finally, in 1980, to the Garrett–Hendler Trust, which was established for the benefit of Tillie Goldring's grandchildren. Mr. Garrett, Mr. Hendler, and Mrs. Goldring were the trustees of the Garrett–Hendler Trust.

For the most part, Messrs. Garrett and Hendler are successful real estate investors who have profitably bought and sold property throughout southern California over the past four decades. Their purchase of the subject property was apparently typical of other acquisitions they made during the same period. Plaintiffs selected the land along Highway 60 shortly after the freeway was built. They believed that Riverside County—which in 1960 was largely agricul-

---

1.  The property can be described as open, grassy fields. There are no natural or artificial barriers to entry to it from one of the secondary roads on either side of Highway 60.

tural—was about to experience economic growth which would result, over time, in a significant appreciation in land values similar to other areas outside Los Angeles. Plaintiffs never intended to develop the land themselves. Instead, they merely planned to hold the property until economic conditions favored commercial development, at which time they expected to sell the land to a developer at a substantial gain.

Riverside County has further divided the subject property above and below Highway 60 into nine assessors' parcels, i.e., 171–020–001, 171–020–004, 171–020–022, and 171–020–023 (below the freeway); and 171–030–001, 171–030–004, 171–030–005, 171–030–012, and 173–180–006 (above the freeway). These parcel numbers shall be helpful in referring to the property later in this Opinion.

Pyrite Canyon, lying above the subject property, is the home of the Stringfellow Acid Pits ("Stringfellow"). Stringfellow is a seventeen-acre former rock quarry which, under the auspices of the State of California, was converted in 1952 to a toxic waste disposal site serving many manufacturing companies associated with the aerospace industry. Stringfellow was chosen for this purpose because it was believed that liquid toxic wastes could safely be deposited there without penetrating the solid limestone basin and contaminating the underlying groundwater, which was the primary source of fresh water for the region. Stringfellow became a focus of public concern in March 1969, when heavy rains caused the pits to overflow, resulting in the release of toxic chemicals down into the canyon and the areas below, including the area which includes the subject property. Stringfellow ceased operations in early 1972.

In 1973, the Santa Ana Regional Water Quality Control Board determined that toxic chemicals had indeed seeped into the aquifer below Stringfellow. The site was declared a public nuisance by Riverside County in 1975, but large-scale cleanup efforts did not begin until 1980. That same year, and in response to the public health threats posed by such sites as Stringfellow, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund"), 42 U.S.C. § 9601 et seq. Under CERCLA the United States Environmental Protection Agency ("EPA") was charged with supervising investigation and remediation activities at Superfund sites throughout the country.

To confront what Congress perceived as the "imminent and substantial endangerment to the public health or welfare or the environment" posed by such facilities as Stringfellow, CERCLA authorized the President, through EPA, to take extraordinary steps to take control of hazardous waste dump sites. Among other things, CERCLA authorized the EPA to enter or seize private property and to impose fines upon persons who interfered or inhibited the EPA's clean-up activities. 42 U.S.C. § 9606 (1994).

In addition, before embarking on or financing a remediation effort, CERCLA required the EPA to enter into a contract or cooperative agreement with the appropriate state government setting forth terms for long-term federal and state cooperation with respect to remediation efforts. The EPA and the State of California Department of Health Services completed a Cooperative Agreement concerning Stringfellow on July 28, 1983. Among other things, the Cooperative Agreement assigned to the State the responsibility for securing access to private property so that either agency or its contractors could conduct remediation activities.

In the early years of the remediation effort, the extent of the environmental contamination from Stringfellow was unknown. Not all of the toxins present at Stringfellow had been fully identified,[2] nor had it been determined whether they could be transmitted through the air or only through the groundwater. Also, it was not known to what extent previous runoffs from the site had contaminated the surface of land down-canyon from the site. The cause of the greatest concern was the possibility of groundwater contamination, of course, because the plume of contaminated water emanating from

---

**2.** Some of the toxic substances detected at Stringfellow were: trichlorethylene; dichloromethane; chloroform, 1; 2–Dichoroethane; tetrachloroethylene; chlorobenzene; cadmium; chromium; and nickel.

Stringfellow appeared likely to reach Glen Avon and nearby communities, where a significant number of homes used well water for drinking and bathing. The same aquifer also flowed into what is known as the Chino III groundwater basin, which was the source of water (through public water lines) for forty thousand people.

Electromagnetic conductivity tests of the soil south of Stringfellow indicated that the plume of contamination emanating from Stringfellow appeared directly under the subject property. However, as of 1983, neither the depth nor the boundaries of the contaminated plume of groundwater were known. There were a few existing groundwater extraction wells in the area (none on the subject property) which could be monitored, but a significant number of additional monitoring wells were required in order to characterize the plume with a degree of certainty.

Based on the information gathered in its preliminary investigations between 1980 and 1983, the EPA determined that monitoring wells needed to be installed on the subject property on both sides of Highway 60. The southernmost extent of the Stringfellow site lies between 3,000 and 4,000 feet northeast of the subject property. The EPA and the State approached plaintiffs concerning this proposal in August 1983 in an effort to reach a "voluntary" agreement on the terms of access for the drilling of the proposed wells. The access agreement proposed drilling three groundwater monitoring wells on plaintiffs' property—two above and one below the Highway and would have provided for periodic monitoring and extraction activities on the property. The proposed access agreement did not provide for any compensation to plaintiffs. As demonstrated by the instant litigation, plaintiffs refused to sign the access agreement.

On September 20, 1983, the EPA, citing various provisions of CERCLA, issued an order compelling plaintiffs to permit state and EPA officials to drill three monitoring wells on the subject property.[3] The order advised plaintiffs that studies suggested that the plume of contaminated groundwater appeared to flow directly under their property and that it was threatening to contaminate the Chino III basin. The order further stated, in part:

Pursuant to Section 106(a) and Sections 104(a), (b), (e) of CERCLA, 42 U.S.C. §§ 9606(a), 9604(a), (b), (e), respondents are hereby ordered, effective immediately, to permit EPA, its employees, agents, contractors, assignees, transferees and successors or other authorized persons, including the State of California and its employees, agents, contractors, assignees, transferees and successors, to have access to the Trust Property, as follows:

A. Access to the Trust Property and locations ... for the following purposes: (1) locating, constructing, operating, maintaining, and repairing, monitor/extraction wells; (2) taking measurements and samples from those wells; (3) performing groundwater extraction operations, if necessary, including off-site disposal of such extracted groundwater.

B. Access to the Trust Property to accomplish all the activities described in paragraph A of this Order, and any necessary activities incident thereto, which shall include but shall not be limited to storing and transporting groundwater, and constructing facilities for such purposes, and the installation, operation, maintenance and repair of electric lines, pipes and storage tanks.

C. Access to the Trust Property to conduct any and all other activities necessary to investigate, monitor, survey, test and perform information gathering to identify the existence and extent of the release of hazardous substances or the threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of the danger to the public health or welfare or to the environment. Such access

---

3. The access order was only addressed to plaintiffs Henry Hendler, Paul Garrett, and Tillie Goldring—the trustees of the Garrett–Hendler Trust—and did not reflect Mr. Gronsky's ownership interest in the same property. Further, the access order mentioned only three of the nine assessors' parcels owned by plaintiffs, apparently because the three parcels mentioned were the planned sites of three wells which EPA, at that time, intended to install.

shall also include any future access to the Trust Property for the purpose of containing and terminating the release and threatened release of hazardous substances, pollutants and contaminants and the imminent and substantial endangerment to public health and welfare and the environment posed at the Trust Property. Respondents are further ordered not to interfere in any manner with EPA/State activity on the Trust Property.

The access order further advised plaintiffs that they could request a conference with EPA officials "to discuss the correctness of any factual determinations upon which the Order is based, the appropriateness of any action which you are hereby ordered to take, or any other relevant issue."[4] The order also notified plaintiffs that, under CERCLA, they could be liable for substantial civil penalties if they failed to comply with the terms of the order. There was no stated limit on the amount of time the access order was to remain in effect.

Well-drilling on the subject property began the morning after the access order was issued. Notwithstanding the fact that the original proposed access agreement called for the installation of just three wells, the EPA and state officials installed a total of twenty monitoring wells on plaintiffs' property over the course of three years.[5] Sixteen wells were drilled by contractors working for the State Department of Health Services, not for the EPA. Eight of those wells, moreover, were installed on the tract of land lying

below Highway 60 between Pyrite Street and the Pyrite Channel. That land, designated as assessor's parcel no. 171–020–001, was owned by plaintiffs but was not mentioned in the access order. The specific reason for the omission of that parcel is unknown, but a reasonable inference is that, since the EPA at the time of issuing the access order contemplated installing only three wells on plaintiffs' property, it was only necessary to identify the three specific parcels where those wells would be located.[6]

Over the course of the years, and continuing to this day, officials or agents of the EPA or the State of California have periodically entered the property for the purpose of monitoring certain aspects of the groundwater, including water levels and water quality.[7] Information derived from the wells contributed substantially to the Stringfellow remediation effort. By 1987, the boundaries of the plume could be identified, including its depth and width. The wells confirmed that the contaminant plume flowed directly under portions of the subject property above and below Highway 60. In addition, using the monitoring wells on plaintiffs' property, the agencies were able to regularly evaluate the success of the Stringfellow cleanup project itself in mitigating the levels of contamination reaching plaintiffs' property and other property and communities down-canyon.

The cleanup of Stringfellow, as demonstrated by monitoring of wells both on and off plaintiffs' property, has been extremely successful. For example, monitoring of groundwater on plaintiffs' property in 1983

---

4. Plaintiffs accepted the invitation to confer with EPA officials. A contentious meeting took place on September 23, 1983, between plaintiffs' counsel, Jerrold Fadem, and four federal government officials. A court reporter transcribed the discussion.

5. The figure of 20 wells was arrived at shortly before trial. In earlier proceedings, the number was misstated as 21 or 22 because the parties were counting certain wells which were mistakenly believed to be on the subject property but which were actually on property not owned by the instant plaintiffs.

6. The court observed most of the monitoring wells on the subject property during a site visit in

July 1995. The wells are approximately six to eight inches in diameter, and most of the 20 wells are confined to three or four clusters which are within 100 feet of public rights of way.

7. There were also entries made by state and EPA officials even prior to the issuance of the access order on September 20, 1983. These entries were generally brief and made for the purpose of undertaking the noninvasive electromagnetic conductivity study already mentioned. The electromagnetic conductivity survey was conducted prior to the issuance of the order. Other noninvasive studies, conducted after the issuance of the access order, included electrical resistivity testing, seismic refractory testing, and soil gas sampling. These tests helped the agencies to determine the probable location of the contami-

showed levels of trichloroethylene ("TCE"), a volatile organic compound which is carcinogenic, as high as 462 parts per billion ("ppb"). Under the Clean Water Act's drinking water standards, TCE should be detectable at a level of no greater than 5 ppb. Recent monitoring of the wells on plaintiffs' property above Highway 60 has shown levels of TCE at well below 5 ppb, *i.e.*, within the EPA safe drinking water standards. Levels of TCE on the property below Highway 60 have declined to between 5.1 and 19 ppb as of May 1995.

During the 1980s, Riverside County was one of the fastest-growing areas in the country. Along with a population explosion came rapid commercial development of the type characteristic throughout most of the country's suburban areas, *i.e.*, major shopping malls and smaller "power centers," which usually consisted of a combination of retail, dining, and financial services built around one of two major retail stores. The court observed a number of such centers throughout Riverside County during its 1995 site visit; virtually all of the major shopping centers in the county were built within the previous 10 years. No significant residential or commercial development has occurred, however, in the Jurupa district or the Glen Avon area in the vicinity of the subject property. Plaintiffs maintain, however, that the subject property is ideally suited for high-density commercial development.

In the period since the wells were installed, plaintiffs have expressed contradictory attitudes and taken contradictory or inconsistent actions with respect to the commercial viability of the subject property. Specifically, plaintiffs have testified that they never believed that the EPA would permit commercial development on the land and that even if the EPA did give such consent, the presence of the wells and the ongoing activities associated with them severely inhibited any development. Mr. Garrett testified at trial that he was unsure whether plaintiffs had the "legal capacity, power and authority" to sell

the property. Tr. 286–87. After initiating the present litigation, plaintiffs never consulted the EPA or the State of California to confirm their assumptions about their legal rights with respect to a potential sale or development. They did attempt, unsuccessfully, to have the zoning of the property changed to permit either commercial/industrial or high density residential use of the land. The land remains zoned for uses other than commercial, industrial, or high-density residential use.[8]

Around the time of their attempt at having the property rezoned, plaintiffs allowed a broker to list the 41 acres south of Highway 60 for a period of 90 days. At least one offer for the asking price was made during this period, but the offeror, I.S. Properties, was apparently never advised of the presence of the wells or the contaminated groundwater on the subject property. Plaintiffs allowed I.S. Properties' offer to expire without taking action. Plaintiffs have communicated with other prospective buyers several times since 1987. At least one prospective purchaser apparently lost interest upon learning of the property's contaminated groundwater and, perhaps, of the ongoing cleanup activities. Plaintiffs have rejected several offers for portions of the subject property, they said at trial, because the price offered was too low or because the prospective buyer refused to comply with other conditions that plaintiffs requested. In the case of the I.S. Properties' offer, negotiations dissolved after the offeror refused to comply with plaintiffs' escrow terms. For example, plaintiffs insisted that any sales contract into which they entered would have to absolve them from any potential liability arising from hazardous substances on or off the property.

On September 30, 1994, the EPA formally terminated the September 1983 access order, apparently as part of an effort to settle the present litigation. Although the EPA's settlement effort did not succeed, the termination remains in effect, though its legal

---

nant plume and, consequently, the best locations for the installation of monitoring wells.

8. In addition, the portion of the subject property above Highway 60 is designated as part of the Pyrite Canyon Policy Area. The Pyrite Canyon

Policy references uses which do not consist of a "high concentration of people" and requires "clearance from the state health department that all significant hazards have been abated and the proposed project can occur without jeopardizing public health and safety." Tr. 2596.

meaning remains in dispute. Implicitly, the termination means that the EPA no longer wishes to have access to plaintiffs' property for the purpose of well-monitoring, except under conditions to which plaintiffs consent. The State of California, however, apparently wishes to maintain access to four of the wells its agents installed on plaintiffs' property between Pyrite Street and the Pyrite Channel, *i.e.*, on the parcel of land not mentioned in the 1983 access order.[9]

### Posture of the Case

Plaintiffs filed suit in 1984 seeking just compensation under the Taking Clause of the Fifth Amendment. Plaintiffs alleged that, as a result of the access order and the subsequent activities undertaken by the EPA and the State of California on the subject property, that they had suffered a physical, or *per se*, taking of their property by defendant. Alternatively, plaintiffs alleged that defendant had effected a regulatory taking of their property by depriving them of any reasonable economic use of the land.

The parties filed cross-motions for summary judgment on both counts. This court held that the issuance of the access order itself did not result in a regulatory taking of plaintiffs' property. As for plaintiffs' physical taking claim, however, the court decided that evidence before it at the pleading stage was insufficient to base a conclusion, so the court set for trial the question of whether the activities undertaken on the subject property constituted a "permanent physical occupation" of their property within the meaning of *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3170–71, 73 L.Ed.2d 868 (1982) (finding a taking where state had ordered permanent installation of cable television equipment on private property). *Hendler v. United States*, 11 Cl.Ct. 91, 96–98 (1986) (Mayer, J.)

In addition to the basic taking claims in dispute at the pleading stage, the parties also disputed the extent to which the Unit-

ed States should be held liable for activities undertaken on the subject property by the State of California. Defendant contended that, under applicable state laws, California officials had authority to enter the property and drill wells regardless of the access order, and defendant contended that the State's activities were in fact undertaken independently of the EPA. Plaintiffs disagreed because the access order specifically authorized the State to enter the property, citing CERCLA. The court did not decide the issue at the pleading stage. Noting undisputed evidence that California had drilled a number of wells on the parcel of land between Pyrite Street and the Pyrite Channel—which was the parcel of land not referenced in the access order—the court determined that trial was necessary to determine the extent of the federal government's liability for the state government's actions. The court held that such liability would have arisen out of an agency relationship between the two governments and that additional evidence was needed in order to establish the existence of such a relationship. 11 Cl.Ct. at 99–100.

Subsequent to that ruling, during the discovery phase, the court granted a motion by defendant to dismiss the case after plaintiffs repeatedly refused to respond to certain interrogatories. *Hendler v. United States*, 19 Cl.Ct. 27, 31–33 (1989) (Robinson, J.). Plaintiffs appealed to the United States Court of Appeals for the Federal Circuit, and the Federal Circuit reversed the dismissal as "improvidently granted." *Hendler v. United States*, 952 F.2d 1364, 1368 (Fed.Cir.1991). The Federal Circuit also reviewed the entire record of the case below and made a number of findings of fact and conclusions of law.

Specifically, the Federal Circuit disagreed with this court's opinion that trial was necessary in order to decide the merits of plaintiffs' physical taking claim. After reviewing prior Supreme Court taking cases, the court found that the installation of the wells on plaintiffs' property and the subsequent en-

---

9. All well-monitoring activities on the subject property are undertaken by a private entity called the Pyrite Canyon Group, which is the State's contractor for these purposes. The Pyrite Canyon Group is composed of the several major

industrial companies who were identified (along with the State of California) in a 1992 Consent Decree as having been responsible for much of the dumping that had occurred at Stringfellow.

tries for the purpose of maintenance and monitoring them constituted a "permanent physical occupation" within the meaning of *Loretto.* The Federal Circuit determined that this court should have granted summary judgment in plaintiffs' favor with respect to their physical taking claim, leaving for trial only a quantum issue. 952 F.2d at 1378. Referring to *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979), the court also determined that the nature of the estate taken was similar to an easement, in that "the Government at its convenience drove equipment upon plaintiffs' land for the purpose of installing and periodically servicing and obtaining information from the various wells it had located there." *Hendler v. United States,* 952 F.2d at 1378.

The Federal Circuit reached even farther with regard to the question of the federal government's liability for the State's activities on the subject property. The court rejected the notion that an agency relationship was necessary in order for the federal government to be liable for California's activities because the "activities of EPA and of California were two coordinate and coordinated parts of the same undertaking." 952 F.2d at 1378. The court noted that the access order:

> authorized access to plaintiffs['] property for "EPA officials and other authorized personnel, including state officials" and that such authority was based on 42 U.S.C. §§ 9606(a), 9604(a), (b), and (e).... Thus, California state officials who entered onto plaintiffs' land did so under the authority granted by CERCLA.

952 F.2d at 1378–79. The court also noted that, in addition to the language of the order itself, the state-federal Cooperative Agreement provided added federal authority for the State's activities on the subject property. *Id.* The court concluded:

> It follows that [the State's] activities *within the scope of the Order* are attributable to the Federal Government for purposes of

takings law just as are the activities of EPA itself.

952 F.2d at 1379 (emphasis added).

With regard to plaintiffs' alternative regulatory taking claim, the Federal Circuit did not disturb this court's prior ruling that the issuance of the access order on September 20, 1983, did not constitute a regulatory taking. The court held, however, that a triable issue remained as to:

> whether subsequent events, in light of the character of the Government's action and plaintiffs' distinct investment-backed expectations, might have had sufficient economic impact on the plaintiffs to constitute a regulatory taking.

952 F.2d at 1375.

On remand, this court bifurcated the trial of liability and damages. The court has now held a liability phase of trial to determine: (1) the nature and extent of the "permanent physical occupation" of the subject property found by the Federal Circuit; (2) the extent to which activities undertaken by the State of California on the subject property were within the scope of the September 20, 1983, access order; and (3) whether activities undertaken by either the United States or the State of California on the subject property after September 20, 1983, constituted a regulatory taking.

## DISCUSSION

### Physical Taking Claim

■ The Federal Circuit compared the interest taken in the subject property as a consequence of the installation of the wells and the ongoing monitoring activities to an easement, 952 F.2d at 1378, and it has been left to this court to determine the scope and effect of that easement. In order to make such a determination, the court must first decide what effect defendant's intrusion has had upon the property. Plaintiffs maintain that the presence of the wells on their property and the ongoing monitoring activities by the EPA, state officials, and contractors effectively prohibit any profitable use of the land. Defendant disagrees, contending that the presence of the wells and the ongoing monitoring and maintenance activities do not, by themselves, inhibit development of the property.[10] Furthermore, defendant con-

10. Defendant also contends that other factors, such as the presence of groundwater contamina-

tion on the property and the property's nearness to the Stringfellow site stigmatized the subject

tends that plaintiffs' beliefs as to the EPA's policy or attitude toward the potential development of the property is based on pure speculation and is false.

Defendant is correct about the purely speculative nature of plaintiffs' contention that the EPA would restrict or oppose any development on the land. Plaintiffs did present one or two witnesses who testified about the EPA's role in other development projects, but such evidence was strictly anecdotal. The unique facts of the instant controversy make it impossible to draw persuasive analogies between extraneous anecdotes and the facts of the present case. The only salient fact regarding the EPA's attitude or policy toward development of all or part of the subject property in the case at hand is that neither the plaintiffs nor a prospective buyer has ever approached the EPA or the State of California with a bona fide plan of development. The various reasons why plaintiffs have never done so are immaterial, notwithstanding how much testimony has been offered about those reasons. The entire question of whether the EPA would look favorably or unfavorably on a plan for developing the subject property is simply a question this court does not need to resolve.

Taking out of consideration the EPA's attitudes and policies toward developing the property, the court is left with determining simply whether the presence of the wells in fact prohibits any economic development of the plaintiffs' land. On this point, the parties agree that the wells can be capped at ground level or below, and that some area around the wells must be kept clear in order to facilitate periodic groundwater measurement and sampling. The parties disagree, however, about the size of the "clear zone" needed around the wells.

At the beginning of trial, plaintiffs took the position, through their expert witnesses, that an entire acre around each well would need to be kept clear in order to accommodate the trucks and other equipment used in well monitoring and maintenance. After cross-examination, plaintiffs' experts drastically modified their per-well estimates, contending that a clear space measuring 50–60 by 80–100 feet per well was needed. Where two or more wells are clustered close together, plaintiffs would allow for a clear space of 70–80 by 120 feet. Defendant's estimation of the amount of clear space was the same as the low-end of plaintiffs' revised estimation, *i.e.*, about 50 foot square around each well with a 16–foot–wide access route needed from a public right-of-way.

In the court's view, the divergence between the parties' estimations of the amount of clear space needed to accommodate well activities has little bearing on the court's ultimate determination as to the nature of the incursion. Both parties agree that, in the event that the property were developed to its full commercial potential, a significant amount of acreage would need to be left open for parking lots or landscaped areas. Such open areas would be far in excess of the amount of space needed to accommodate the occasional well activities, and both parties' experts further agree that the parking lots or landscaped spaces can be planned to coincide with the open spaces needed for the wells, and that the wells could be capped flush with the ground surface of such areas.[11]

The court observed wells on private property during its site visit which were finished in a similar way as described here, *i.e.*,

property and, consequently, inhibited its developability. Plaintiffs disagree. The court shall address this dispute in its analysis of plaintiffs' regulatory taking claim.

11. To be more precise, two of plaintiffs' experts, Pike Oliver and Sean Shahin, agreed that landscaped spaces or parking areas could be planned to coincide with the wells on the subject property. However, one of plaintiffs' experts, Donald Bauer, testified unconvincingly that even though

the wells could be sited on landscaped or parking areas, they would need to be further set apart in such areas by fencing, either to protect the wells from vandalism or to protect the public from the possibility of toxic contact with the wells. Mr. Bauer's testimony on this point was extremely conjectural and not supported by any studies or personal experience of his own and, accordingly, has been discounted in preparing this Opinion.

capped at or below the surface of the ground and protected by some sort of metallic manhole cover. Moreover, defendant at trial introduced into evidence photographs of similar monitoring wells in various commercial locations in southern California capped in this manner. Such groundwater monitoring wells, in fact, can be observed on the grounds of filling stations throughout the United States.

Plaintiffs' development expert, Pike Oliver, considered it an important distinction that most of the monitoring wells observed by the court in person or in photographs were installed after the property had been developed, whereas any future commercial development on the subject property would have to be designed around the wells, which are already installed. The court, however, is unimpressed by this distinction, finding it to be, at best, a chicken-or-egg problem. Mr. Oliver admitted, when pressed by the court to clarify his position, that he had no relevant experience or knowledge upon which to base his opinion that it would be more burdensome on a landowner to design a commercial development project around monitoring wells than to install wells after commercial development has occurred. Thus, the singularity of the incursion on plaintiffs' property by the wells by virtue of their need for periodic monitoring and maintenance activities must be seen as purely speculative.

Plaintiffs also distinguished the wells on the subject property from others identified in defendant's evidence by the fact that the wells on the subject property are significantly deeper than those found on the commercial properties identified by defendant. Plaintiffs presented no persuasive expert testimony, however, supporting their inference that the greater depth of the wells on the subject property constituted a greater hindrance to development than shallower wells.

Finally, plaintiffs maintain that the wells in defendant's evidence are distinguishable from the wells on the subject property be-

cause the contamination monitored by the wells in defendant's evidence originated on properties where they were installed. Most of those properties were sites of former gas stations where underground storage tanks had leaked fuel into the surrounding soil and groundwater. Plaintiffs point out that in the present case, the wells on the subject property are monitoring contamination which originated up-canyon at the Stringfellow site, and not on the subject property. The court finds this distinction unpersuasive, however. Both the wells on the subject property and the wells identified in defendant's evidence were installed to monitor contamination which was actually detected on the property where the wells were drilled, regardless of whether the contamination originated from a different piece of property.

Plaintiffs are left, therefore, with an incursion on their property which is similar to that of an easement for electrical cables or water or sewer lines—easements which, like in the present case, require portions of the property to be available for occasional access by the utility but which otherwise do not materially interfere with the property's day-to-day use, even in those areas occupied by the wells. This is the extent and scope of the estate which the Federal Circuit has already held to have been taken. In the damages phase of trial, the parties will have the opportunity to present evidence relevant to compensation for the physical taking of well easements. The court accepts the Federal Circuit's finding that California officials were acting under the authority of the EPA's access order, 952 F.2d at 1379, but only to the extent of the sixteen wells installed by the State. The court finds each well easement comprises a 50 by 50 foot square area for activities related to the well(s) contained therein with a 16 foot wide access corridor to a public right of way. The court finds that in some instances a single 50 foot square easement and access corridor may be adequate to accommodate an entire well cluster. The parties' submission of evidence in the damages phase shall be consistent with the factual and legal determinations set forth in this Opinion.

### Regulatory Taking Claim

As discussed earlier, the Federal Circuit instructed this court to make findings on the issue of whether activities undertaken on plaintiffs' property in the period since the access order was issued on September 20, 1983, constituted a regulatory taking. A "regulatory" taking is distinguished from a "physical" taking in case law as occurring when a regulatory or administrative action places such burdens on the ownership of private property that essential elements of such ownership must be viewed as having been taken, even if the regulatory or administrative action has not deprived the owner of title or possession. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

Beyond that basic concept, a steady stream of case law has identified three fundamental elements which must be considered in determining whether a regulatory or administrative action rises to such a level as to require compensation pursuant to the Fifth Amendment: (1) the character of the government action; (2) the economic impact of the action; and (3) the extent to which the action interferes with a plaintiff's distinct investment-backed expectations. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

Following subsequent Supreme Court precedents, the Federal Circuit has clarified these standards somewhat. Specifically, the "character of the government action" standard has been defined as requiring, as a prerequisite to compensation under the Fifth Amendment, that the regulatory or administrative imposition be one that affects "an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir. 1994); *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1028, 112 S.Ct. 2886, 2899–2900, 120 L.Ed.2d 798 (1992) (concerning the Fifth Amendment's Taking Clause as applied to states through the Fourteenth Amendment). The rationale for this requirement is that, in acting to protect public health and safety, the government is merely exercising its rights under a pre-existing limitation on the use of private property. Because a property owner does not have a right to use his property in a manner harmful to public health or safety, the government's exercise of its powers to protect public health or safety does not constitute a compensable taking of any of the owner's property rights. *Lucas*, 505 U.S. at 1029 & n. 16, 112 S.Ct. at 2900 & n. 16; *Loveladies Harbor*, 28 F.3d at 1178–79; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 480, 107 S.Ct. 1232, 1239, 94 L.Ed.2d 472 (1987); *Penn Central*, 438 U.S. at 125, 98 S.Ct. at 2659–60; *Allied–General Nuclear Servs. v. United States*, 839 F.2d 1572, 1576 (Fed.Cir. 1988); *B & F Trawlers, Inc. v. United States*, 27 Fed.Cl. 299, 304–05 (1992); and the cases cited therein.

In the present case plaintiffs do not dispute that the wells were installed on their property in an effort to abate a public nuisance. They insist, however, that the installation of the wells on the subject property was unnecessary and unfair because the contamination did not originate on that property. To the extent that monitoring wells were needed in the area south of Stringfellow, plaintiffs maintain that such wells could have been installed in other locations, including public rights of way, without the need for incursion onto plaintiffs' property. Furthermore, plaintiffs point out that the contamination on their property was solely in the groundwater—more than fifty feet below the surface—and that ordinary use of the property for commercial development would not have contributed to the contamination risks emanating from the Stringfellow site. Accordingly, plaintiffs argue that defendant's actions in installing the wells and subsequent monitoring activities should not be viewed as governmental actions to abate a nuisance.

The court has considered these arguments in light of the facts brought out at trial as well as the case precedents and has found plaintiffs' position to be without merit. It is

true that the contamination originated at Stringfellow and not on their property, but the contamination was hardly confined to the Stringfellow site. In fact, the contamination was moving, via a plume of groundwater, south down Pyrite Canyon, where it threatened to poison the drinking water supplies of thousands of residents. The monitoring wells were installed on plaintiffs' property because the EPA's and the State's researchers believed, after a noninvasive study, that the plume was flowing directly underneath the subject property. Once the wells were installed, periodic sampling and monitoring enabled the two governments to identify the width, depth, and composition of the plume, and thereby enabled them to assess the extent of the public health threat. To this day the wells continue to provide valuable information allowing the governments to evaluate the success of the clean-up efforts. It is possible that such data could have been obtained from wells located somewhere other than on the subject property, but it is highly doubtful that such data would have been as useful in characterizing the plume because for several thousand feet the plume flows directly and exclusively under the subject property.[12] The court concludes, therefore, that the installation of the wells on plaintiffs' property was necessary in order to abate the nuisance posed by Stringfellow. It follows, furthermore, that public injury, due to insufficient data, would likely have resulted from installation of the wells in locations other than on the subject property. In light of these findings, the "character of the government action" must be seen as falling squarely within the nuisance exception described in *Loveladies, Lucas,* and other cases.[13]

■ Having disposed of the "character of the government action" consideration in fa-

vor of defendant, it is unnecessary to weigh the economic impact of the installation of the wells and related activities on plaintiffs' reasonable investment-backed expectations. This is so because the nuisance exception applies equally to physical taking and regulatory taking analysis. Nonetheless, since the court received ample evidence at trial concerning the alleged economic impact of the wells, the court shall briefly address these issues so as to obviate any possible need for rehearing of the same evidence.

The bulk of the "economic impact" evidence presented at trial concerned the parties' competing notions of the value of the land subsequent to the installation of the wells. Plaintiffs argue that the property was stigmatized by the installation of the wells and that the stigmatizing effect has continued through to the present day because of the continuing need of the EPA and the State of California to maintain and periodically monitor the wells. Plaintiffs contend that the stigma is manifold. The wells, they argue, restrict the kinds of uses to which the land may be put because of the need for periodic governmental access to the wells; even more importantly, the wells also create the impression that the subject property itself is source of a health hazard, even though the hazard is far below the surface and even though development on the land is not likely to exacerbate the contamination.

Plaintiffs maintain that their property would have been an ideal location for the kind of commercial development which propagated rapidly throughout the late 1980s in

---

**12.** Plaintiffs' experts suggested at trial that the wells could have been installed on the Highway 60 right-of-way which cuts through the property in an east-west direction. One of plaintiffs' experts even suggested that monitoring wells should have been drilled on the freeway itself. The court finds, however, that the current use of the right-of-way to accommodate a busy freeway is extremely incompatible with drilling monitoring wells and related activities.

**13.** In this court's understanding, the nuisance exception applied in this case would obviate the

need for compensation even under the physical taking theory. The court notes, moreover, that the exception was most recently clarified in *Loveladies* and *Lucas*—cases decided *after* the Federal Circuit's 1991 *Hendler* decision holding that the instant plaintiffs had suffered a compensable "permanent physical occupation" of their property. *See* 952 F.2d at 1374, 1378. Nonetheless, this court shall stick to the Federal Circuit's findings on the physical taking theory as the law of the case and award compensation for such taking as set forth in this Opinion.

Riverside County—*i.e.*, suburban strip-malls and retail centers providing outlets for major chain stores and restaurants as well as a variety of other services. The court viewed many such developments during its site visit, most of them built during the peak 1985–91 period. Because of its great commercial development potential, plaintiffs believe they could have sold their raw land for more than $20 million during the peak period if not for the monitoring wells.[14]

Defendant counters that the subject property is indeed stigmatized, but defendant argues that the cause of the stigma is not the wells but rather the contaminated groundwater which is flowing down-canyon from Stringfellow and directly under plaintiffs' property. Furthermore, defendant contends that its actions in installing monitoring wells and in maintaining and monitoring those wells over the years has actually benefitted plaintiffs' property by providing specific information necessary to assess the risks emanating from Stringfellow and evaluate potential hazards arising from development of the subject property itself.

Defendant also disagrees with plaintiffs' contention that the subject property would have been developable if the wells had not been installed there in 1983–85. Defendant maintains that existing regulatory constraints (unrelated to the subject property but justified because of its nearness to Stringfellow) would have required plaintiffs or any other developer of the subject property to obtain the same specific information about the contamination underlying the property which has thus far been made available solely through the efforts of defendant and the State of California. Both parties agree that had a private party undertaken the same tests and analyses of the contamination of the subject property as part of a plan of development, such efforts would have cost at least $100,000.[15]

Defendant further contends that the subject property's nearness to the Stringfellow site, gave it a well-publicized reputation throughout California as a major toxic waste dump and a source of potential health hazards. Thus, even if the subject property was safe for development—a point which defendant does not concede—such development would inevitably be a source of serious public concern. Ironically, defendant points out that a determination of the relative safety of development on the subject property became possible only because of information provided by the monitoring wells installed there.

Finally, defendant points out that the booming economic development which struck Riverside County in the 1980s managed to elude the Jurupa district and the Glen Avon community—*i.e.*, those areas which are nearest to the subject property. Unlike most other populated regions of the county, these areas along Highway 60 saw little new commercial or residential development during the 1980s, and they remain semi-rural today. Accordingly, defendant considers plaintiffs' expectations as to the market value of their property to be exaggerated because they are based on the kinds of developments which generally did not seek to locate themselves in

14. The court notes that despite the court's exhortations to the contrary, plaintiffs presented a great deal of testimony concerning the regulatory effect of the 1983 access order and its alleged detrimental impact on the marketability and developability of the subject property. The court believes the effect of the order itself, as not meeting the applicable criteria for a compensable regulatory taking, was decided previously with respect to defendant's first motion for summary judgment. 11 Cl.Ct. at 96, *aff'd*, 952 F.2d at 1375. Accordingly, following the law of the case, this discussion is limited to determining whether activities undertaken on the subject property subsequent to the issuance of the access order resulted in a regulatory taking of plaintiffs' property rights.

15. Both parties' experts explained that property suspected of containing contamination is investigated in two phases—usually by a highly paid consultant—when a property owner is preparing a plan of development. Phase One is an assessment of the likelihood of contamination based on available public records and historical data, and Phase Two is scientific analysis involving actual testing and sampling. Phase Two is generally undertaken only when Phase One provides reason to suspect that subsurface contamination is present.

In the present case, the information generated by the EPA's and the State's activities on the subject property is equivalent, at the very least, to a completed Phase Two investigation.

the Jurupa district during the period since the wells were installed.

In addition, defendant presented evidence showing that the kinds of economic activities for which plaintiffs consider their property to be ideally suited are not consistent with current zoning and land-use designations as set forth by the appropriate authorities in Riverside County. Under current land-use designations, the only portion of the subject property designated for commercial use is the eight-acre strip between Pyrite Street and the Pyrite Channel below Highway 60. The remainder of the land below Highway 60 is designated for residential use, and the entire area above the highway is designated as part of the "Pyrite Canyon Policy Area"—a special zone created in the vicinity of Stringfellow wherein additional layers of state and county-level clearances were established in order to ensure that proposed development did not jeopardize the Stringfellow cleanup efforts. The most significant restraints on the development of plaintiffs' property were the groundwater contamination and the land-use designations.

■ The plaintiffs have failed to show that the EPA's activities pursuant to the access order had a sufficient adverse economic impact on the value of the subject property to constitute a regulatory taking. A regulation that does not decrease the value of regulated property does not give rise to a taking claim. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 593–94, 82 S.Ct. 987, 989–90, 8 L.Ed.2d 130 (1962) (holding that a regulation prohibiting excavations below groundwater level was not a taking because the regulation only limited some forms of development, but did not decrease market value). The EPA order was never invoked to bar any sale or development of plaintiffs' property. Plaintiffs' expert conceded that the monitoring wells could have been incorporated into a commercial development without significant difficulty. Tr. 1821.

The evidence shows that the value of plaintiffs' property was reduced by the contamination, rather than by the actions pursuant to the access order. The actions taken pursuant to the EPA order to investigate and remediate the contamination enhanced the value of the subject property. The EPA's

and California's actions have reduced the levels of contamination close to or below Safe Drinking Water Act standards. Tr. 3086–97. The remediation of the contamination restored value to plaintiffs' property and increased its marketability and financeability.

■ Even if the EPA's activities had an incremental adverse impact on the subject property's marketability, a "mere diminution" cannot constitute a regulatory taking. *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 645, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993); *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631 (1978). The Supreme Court has explained, "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). When the regulation giving rise to the diminution provides benefits to the landowner, such that it secured an "average reciprocity of advantage" for everyone involved, the mere diminution rule is even stronger. *See Pennsylvania Coal Co.*, 260 U.S. at 415, 43 S.Ct. at 160. The easements imposed by the monitoring wells were worth $14,500. Plaintiffs, however, received an average reciprocity of advantage from the EPA's activities. The evidence shows that the investigation and remediation of contamination on plaintiffs' property conferred a benefit, which offset any nominal adverse impact from the access order or the monitoring wells.

Moreover, the activities taken pursuant to the access order did not interfere with plaintiffs' reasonable investment-backed expectations. No evidence was presented to show that the EPA order was invoked to interfere with plaintiffs' ability to sell the subject property. Plaintiffs failed to disclose the existence of the EPA order to any of the prospective purchasers, and none of the proposals for purchase of the subject property were made with knowledge of it. Plaintiffs have failed to show any nexus between the EPA's actions and their failure to sell the subject property. *See B.W. Parkway Assocs., Ltd.*

*Partnership v. United States,* 29 Fed.Cl. 669, 680–81 (1993) (finding "government's actions did not actually interfere" with plaintiff's planned development).

 Plaintiffs failed to explore economically beneficial uses of their property that would not interfere with investigation and remediation of the contamination on their property. The plaintiffs never contacted the EPA to clarify whether future development of their property would interfere with the investigation and remediation efforts. Even if a government agency has restricted the availability of some uses, it has been "unequivocally held *not* to effect a taking" if there are other means by which a property owner may make "economically viable" use of the land. *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 801 (Fed.Cir.1993). A property owner has an affirmative obligation to take reasonable steps to determine what economically beneficial uses of his land remain after a regulatory action. In *767 Third Ave. Assocs. v. United States,* 48 F.3d 1575 (Fed.Cir. 1995), the Treasury Department posted a Notice barring access to a property leased by the former Republic of Yugoslavia. The owner of the property did not seek clarification from the Treasury Department regarding the Notice, but instead filed suit for a regulatory taking. The Federal Circuit found the owner's "failure to explore all possibilities serves to bar any regulatory taking claim." *Id.* at 1584. Similarly, the plaintiffs in this case did not seek to have the access order clarified, modified, or narrowed in order to pursue any prospective sale or development of their property. Instead, plaintiffs filed this lawsuit. Plaintiffs' conduct was not reasonable to determine what economic uses of the property remained; therefore, their regulatory taking claim is without merit and must be dismissed.

### CONCLUSION

From the outset, plaintiffs have pursued their taking claims with unparalleled vigor and tenacity. Unfortunately, they have done so at great expense to themselves and defendant. The parties will now have the opportunity to present evidence as to the value of the physical taking: well easements and associated access corridors. The parties' presentation of evidence in the damages phase of trial shall be consistent with the factual and legal determinations announced in this Opinion.